ROSTKER, DIRECTOR OF SELECTIVE SERVICE *v.*
GOLDBERG ET AL.

No. 80–251.   Argued March 24, 1981—Decided June 25, 1981

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, POWELL, and STEVENS, JJ., joined. WHITE, J., *post*, p. 83, and MARSHALL, J., *post*, p. 86, filed dissenting opinions, in which BRENNAN, J., joined.

*Solicitor General McCree* argued the cause for appellant. With him on the briefs were *Assistant Attorney General Daniel, Acting Assistant Attorney General Martin, Deputy Solicitor General Claiborne, Barbara E. Etkind, William Kanter,* and *Mark H. Gallant.*

*Donald L. Weinberg* argued the cause for appellees. With

him on the brief were *Harold E. Kohn, Stuart H. Savett, Isabelle Katz Pinzler, Bruce J. Ennis,* and *Laurence H. Tribe.*\*

JUSTICE REHNQUIST delivered the opinion of the Court.

The question presented is whether the Military Selective Service Act, 50 U. S. C. App. § 451 *et seq.* (1976 ed. and Supp. III), violates the Fifth Amendment to the United States Constitution in authorizing the President to require the registration of males and not females.

I

Congress is given the power under the Constitution "To raise and support Armies," "To provide and maintain a Navy," and "To make Rules for the Government and Regulation of the land and naval Forces." Art. I, § 8, cls. 12–14. Pursuant to this grant of authority Congress has enacted the Military Selective Service Act, 50 U. S. C. App. § 451 *et seq.* (1976 ed. and Supp. III) (the MSSA or the Act). Section 3 of the Act, 62 Stat. 605, as amended, 50 U. S. C. App. § 453, empowers the President, by proclamation, to require the registration of "every male citizen" and male resident aliens between the ages of 18 and 26. The purpose of this registration is to facilitate any eventual conscription: pursuant to § 4 (a) of the Act, 62 Stat. 605, as amended, 50 U. S. C. App. § 454 (a), those persons required to register under § 3 are liable for

---

\*Briefs of *amici curiae* urging reversal were filed by *Dennis Rapps* and *A. David Stern* for the Orthodox Jewish Coalition on the Draft; and by *Nathan Lewin* for Stacy Acker et al.

Briefs of *amici curiae* urging affirmance were filed by *Daniel Marcus* for Congressman Robert W. Kastenmeier et al.; by *Paul Kenney* for Men's Rights, Inc.; by *Barbara A. Brown, Thomas J. Hart, Phyllis N. Segal,* and *Judith I. Avner* for the National Organization for Women; and by *Judith L. Lichtman* for the Women's Equity Action League Educational and Legal Defense Fund et al.

*Daniel J. Popeo* and *Paul D. Kamenar* filed a brief for Congressman Lawrence P. McDonald et al. as *amici curiae.*

training and service in the Armed Forces. The MSSA registration provision serves no other purpose beyond providing a pool for subsequent induction.

Registration for the draft under § 3 was discontinued in 1975. Presidential Proclamation No. 4360, 3 CFR 462 (1971–1975 Comp.), note following 50 U. S. C. App. § 453. In early 1980, President Carter determined that it was necessary to reactivate the draft registration process.[1] The immediate impetus for this decision was the Soviet armed invasion of Afghanistan. 16 Weekly Comp. of Pres. Doc. 198 (1980) (State of the Union Address). According to the administration's witnesses before the Senate Armed Services Committee, the resulting crisis in Southwestern Asia convinced the President that the "time has come" "to use his present authority to require registration . . . as a necessary step to preserving or enhancing our national security interests." Department of Defense Authorization for Appropriations for Fiscal Year 1981: Hearings on S. 2294 before the Senate Committee on Armed Services, 96th Cong., 2d Sess., 1805 (1980) (hereafter Hearings on S. 2294) (joint statement of Dr. John P. White, Deputy Director, Office of Management and Budget, Dr. Bernard Rostker, Director, Selective Service System, and Richard Danzig, Principal Deputy Assistant Secretary of Defense). The Selective Service System had been inactive, however, and funds were needed before reactivating registration. The President therefore recommended that funds be transferred from the Department of Defense to the separate Selective Service System. H. R. Doc. No. 96–267, p. 2 (1980). He also recommended that Congress take action to amend the MSSA to permit the registration and conscription of women as well as men. See House Committee on Armed Services, Presidential Recom-

---

[1] The President did not seek conscription. Since the Act was amended to preclude conscription as of July 1, 1973, Pub. L. 92–129, 85 Stat. 353, 50 U. S. C. App. § 467 (c), any actual conscription would require further congressional action. See S. Rep. No. 96–826, p. 155 (1980).

mendations for Selective Service Reform—A Report to Congress Prepared Pursuant to Pub. L. 96–107, 96th Cong., 2d Sess., 20–23 (Comm. Print No. 19, 1980) (hereinafter Presidential Recommendations), App. 57–61.

Congress agreed that it was necessary to reactivate the registration process, and allocated funds for that purpose in a Joint Resolution which passed the House on April 22 and the Senate on June 12. H. J. Res. 521, Pub. L. 96–282, 94 Stat. 552. The Resolution did not allocate all the funds originally requested by the President, but only those necessary to register males. See S. Rep. No. 96–789, p. 1, n. 1, and p. 2 (1980); 126 Cong. Rec. 13895 (1980) (Sen. Nunn). Although Congress considered the question at great length, see *infra*, at 72–74, it declined to amend the MSSA to permit the registration of women.

On July 2, 1980, the President, by Proclamation, ordered the registration of specified groups of young men pursuant to the authority conferred by § 3 of the Act. Registration was to commence on July 21, 1980. Proclamation No. 4771, 3 CFR 82 (1980).

These events of last year breathed new life into a lawsuit which had been essentially dormant in the lower courts for nearly a decade. It began in 1971 when several men subject to registration for the draft and subsequent induction into the Armed Services filed a complaint in the United States District Court for the Eastern District of Pennsylvania challenging the MSSA on several grounds.[2] A three-judge Dis-

---

[2] Plaintiffs contended that the Act amounted to a taking of property without due process, imposed involuntary servitude, violated rights of free expression and assembly, was unlawfully implemented to advance an unconstitutional war, and impermissibly discriminated between males and females. The District Court denied plaintiffs' application to convene a three-judge District Court and dismissed the suit, *Rowland* v. *Tarr*, 341 F. Supp. 339 (1972). On appeal, the Court of Appeals for the Third Circuit affirmed the dismissal of all claims except the discrimination claim, and remanded the case to the District Court to determine if this claim

-trict Court was convened in 1974 to consider the claim of unlawful gender-based discrimination which is now before us.[3] On July 1, 1974, the court declined to dismiss the case as moot, reasoning that although authority to induct registrants had lapsed, see n. 1, *supra*, plaintiffs were still under certain affirmative obligations in connection with registration. *Rowland* v. *Tarr*, 378 F. Supp. 766. Nothing more happened in the case for five years. Then, on June 6, 1979, the court Clerk, acting pursuant to a local rule governing inactive cases, proposed that the case be dismissed. Additional discovery thereupon ensued, and defendants moved to dismiss on various justiciability grounds. The court denied the motion to dismiss, ruling that it did not have before it an adequate record on the operation of the Selective Service System and what action would be necessary to reactivate it. *Goldberg* v. *Tarr*, 510 F. Supp. 292 (1980). On July 1, 1980, the court certified a plaintiff class of "all male persons who are registered or subject to registration under 50 U. S. C. App. § 453 or are liable for training and service in the armed forces of the United States under 50 U. S. C. App. §§ 454, 456 (h) and 467 (c)." 509 F. Supp. 586, 589.[4]

---

was substantial enough to warrant the convening of a three-judge court under then-applicable 28 U. S. C. § 2282 (1970 ed.) and whether plaintiffs had standing to assert that claim. 480 F. 2d 545 (1973). On remand, the District Court answered both questions in the affirmative, resulting in the convening of the three-judge court which decided the case below. The Act authorizing three-judge courts to hear claims such as this was repealed in 1976, Pub. L. 94–381, §§ 1 and 2, 90 Stat. 1119, but remains applicable to suits filed before repeal, § 7, 90 Stat. 1120.

[3] As the Court stated in *Schlesinger* v. *Ballard*, 419 U. S. 498, 500, n. 3 (1975): "Although it contains no Equal Protection Clause as does the Fourteenth Amendment, the Fifth Amendment's Due Process Clause prohibits the Federal Government from engaging in discrimination that is 'so unjustifiable as to be violative of due process.' *Bolling* v. *Sharpe*, 347 U. S. 497, 499."

[4] When entering its judgment on July 18, the District Court redefined the class to include "[a]ll male persons who are registered under 50 U. S. C. App. § 453 or are liable for training and service in the armed forces of

On Friday, July 18, 1980, three days before registration was to commence, the District Court issued an opinion finding that the Act violated the Due Process Clause of the Fifth Amendment and permanently enjoined the Government from requiring registration under the Act. The court initially determined that the plaintiffs had standing and that the case was ripe, determinations which are not challenged here by the Government. Turning to the merits, the court rejected plaintiffs' suggestions that the equal protection claim should be tested under "strict scrutiny," and also rejected defendants' argument that the deference due Congress in the area of military affairs required application of the traditional "minimum scrutiny" test. Applying the "important government interest" test articulated in *Craig* v. *Boren,* 429 U. S. 190 (1976), the court struck down the MSSA. The court stressed that it was not deciding whether or to what extent women should serve in combat, but only the issue of registration, and felt that this "should dispel any concern that we are injecting ourselves in an inappropriate manner into military affairs." 509 F. Supp., at 597. See also *id.,* at 599, nn. 17 and 18. The court then proceeded to examine the testimony and hearing evidence presented to Congress by representatives of the military and the Executive Branch, and concluded on the basis of this testimony that "military opinion, backed by extensive study, is that the availability of women registrants would materially increase flexibility, not hamper it." *Id.,* at 603. It rejected Congress' contrary determination in part because of what it viewed as Congress' "inconsistent positions" in declining to register women yet spending funds to recruit them and expand their opportunities in the military. *Ibid.*

---

the United States under 50 U. S. C. App. §§ 454, 456 (h) and 467 (c); and who are also either subject to registration under Presidential Proclamation No. 4771 (July 2, 1980) or are presently registered with the Selective Service System." 509 F. Supp., at 605.

The Director of Selective Service immediately filed a notice of appeal and the next day, Saturday, July 19, 1980, JUSTICE BRENNAN, acting in his capacity as Circuit Justice for the Third Circuit, stayed the District Court's order enjoining commencement of registration. 448 U. S. 1306. Registration began the next Monday. On December 1, 1980, we noted probable jurisdiction. 449 U. S. 1009.

## II

Whenever called upon to judge the constitutionality of an Act of Congress—"the gravest and most delicate duty that this Court is called upon to perform," *Blodgett* v. *Holden,* 275 U. S. 142, 148 (1927) (Holmes, J.)—the Court accords "great weight to the decisions of Congress." *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94, 102 (1973). The Congress is a coequal branch of government whose Members take the same oath we do to uphold the Constitution of the United States. As Justice Frankfurter noted in *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123, 164 (1951) (concurring opinion), we must have "due regard to the fact that this Court is not exercising a primary judgment but is sitting in judgment upon those who also have taken the oath to observe the Constitution and who have the responsibility for carrying on government." The customary deference accorded the judgments of Congress is certainly appropriate when, as here, Congress specifically considered the question of the Act's constitutionality. See, *e. g.,* S. Rep. No. 96–826, pp. 159–161 (1980); 126 Cong. Rec. 13880–13882 (1980) (Sen. Warner); *id.,* at 13896 (Sen. Hatfield).

This is not, however, merely a case involving the customary deference accorded congressional decisions. The case arises in the context of Congress' authority over national defense and military affairs, and perhaps in no other area has

the Court accorded Congress greater deference. In rejecting the registration of women, Congress explicitly relied upon its constitutional powers under Art. I, § 8, cls. 12–14. The "specific findings" section of the Report of the Senate Armed Services Committee, later adopted by both Houses of Congress, began by stating:

> "Article I, section 8 of the Constitution commits exclusively to the Congress the powers to raise and support armies, provide and maintain a Navy, and make rules for Government and regulation of the land and naval forces, and pursuant to these powers it lies within the discretion of the Congress to determine the occasions for expansion of our Armed Forces, and the means best suited to such expansion should it prove necessary." S. Rep. No. 96–826, *supra,* at 160.

See also S. Rep. No. 96–226, p. 8 (1979). This Court has consistently recognized Congress' "broad constitutional power" to raise and regulate armies and navies, *Schlesinger* v. *Ballard,* 419 U. S. 498, 510 (1975). As the Court noted in considering a challenge to the selective service laws: "The constitutional power of Congress to raise and support armies and to make all laws necessary and proper to that end is broad and sweeping." *United States* v. *O'Brien,* 391 U. S. 367, 377 (1968). See *Lichter* v. *United States,* 334 U. S. 742, 755 (1948).

Not only is the scope of Congress' constitutional power in this area broad, but the lack of competence on the part of the courts is marked. In *Gilligan* v. *Morgan,* 413 U. S. 1, 10 (1973), the Court noted:

> "[I]t is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments,

subject *always* to civilian control of the Legislative and Executive Branches."

See also *Orloff* v. *Willoughby,* 345 U. S. 83, 93–94 (1953).[5]

The operation of a healthy deference to legislative and executive judgments in the area of military affairs is evident in several recent decisions of this Court. In *Parker* v. *Levy,* 417 U. S. 733, 756, 758 (1974), the Court rejected both vagueness and overbreadth challenges to provisions of the Uniform Code of Military Justice, noting that "Congress is permitted to legislate both with greater breadth and with greater flexibility" when the statute governs military society, and that "[w]hile the members of the military are not excluded from the protection granted by the First Amendment, the different character of the military community and of the military mission requires a different application of those protections." In *Middendorf* v. *Henry,* 425 U. S. 25 (1976), the Court noted that in considering due process claims in the context of a summary court-martial it "must give particular deference to the determination of Congress, made under its authority to regulate the land and naval forces, U. S. Const., Art. I, § 8," concerning what rights were available. *Id.,* at 43. See also *id.,* at 49–50 (POWELL, J., concurring). Deference to the judgment of other branches in the area of military affairs also played a major role in *Greer* v. *Spock,* 424 U. S. 828, 837–838 (1976), where the Court upheld a ban on political speeches by civilians on a military base, and *Brown* v. *Glines,* 444 U. S. 348 (1980), where the Court upheld regulations imposing a prior restraint on the right to petition of military personnel.

---

[5] See also *Simmons* v. *United States,* 406 F. 2d 456, 459 (CA5), cert. denied, 395 U. S. 982 (1969) ("That this court is not competent or empowered to sit as a super-executive authority to review the decisions of the Executive and Legislative branches of government in regard to the necessity, method of selection, and composition of our defense forces is obvious and needs no further discussion").

See also *Burns* v. *Wilson,* 346 U. S. 137 (1953); *United States* v. *MacIntosh,* 283 U. S. 605, 622 (1931).

In *Schlesinger* v. *Ballard, supra,* the Court considered a due process challenge, brought by males, to the Navy policy of according females a longer period than males in which to attain promotions necessary to continued service. The Court distinguished previous gender-based discriminations held unlawful in *Reed* v. *Reed,* 404 U. S. 71 (1971), and *Frontiero* v. *Richardson,* 411 U. S. 677 (1973). In those cases, the classifications were based on "overbroad generalizations." See 419 U. S., at 506–507. In the case before it, however, the Court noted:

> "[T]he different treatment of men and women naval officers . . . reflects, not archaic and overbroad generalizations, but, instead, the demonstrable fact that male and female line officers in the Navy are *not* similarly situated with respect to opportunities for professional service. Appellee has not challenged the current restrictions on women officers' participation in combat and in most sea duty." *Id.,* at 508.

In light of the combat restrictions, women did not have the same opportunities for promotion as men, and therefore it was not unconstitutional for Congress to distinguish between them.

None of this is to say that Congress is free to disregard the Constitution when it acts in the area of military affairs. In that area, as any other, Congress remains subject to the limitations of the Due Process Clause, see *Ex parte Milligan,* 4 Wall. 2 (1866); *Hamilton* v. *Kentucky Distilleries & Warehouse Co.,* 251 U. S. 146, 156 (1919), but the tests and limitations to be applied may differ because of the military context. We of course do not abdicate our ultimate responsibility to decide the constitutional question, but simply recognize that the Constitution itself requires such deference to congressional choice. See *Columbia Broadcasting System,*

*Inc.* v. *Democratic National Committee,* 412 U. S., at 103. In deciding the question before us we must be particularly careful not to substitute our judgment of what is desirable for that of Congress, or our own evaluation of evidence for a reasonable evaluation by the Legislative Branch.

The District Court purported to recognize the appropriateness of deference to Congress when that body was exercising its constitutionally delegated authority over military affairs, 509 F. Supp., at 596, but it stressed that "[w]e are not here concerned with military operations or day-to-day conduct of the military into which we have no desire to intrude." *Ibid.* Appellees also stress that this case involves civilians, not the military, and that "the impact of registration on the military is only indirect and attenuated." Brief for Appellees 19 (emphasis omitted). We find these efforts to divorce registration from the military and national defense context, with all the deference called for in that context, singularly unpersuasive. *United States* v. *O'Brien,* 391 U. S. 367 (1968), recognized the broad deference due Congress in the selective service area before us in this case. Registration is not an end in itself in the civilian world but rather the first step in the induction process into the military one, and Congress specifically linked its consideration of registration to induction, see, *e. g.,* S. Rep. No. 96–826, pp. 156, 160 (1980). Congressional judgments concerning registration and the draft are based on judgments concerning military operations and needs, see, *e. g., id.,* at 157 ("the starting point for any discussion of the appropriateness of registering women for the draft is the question of the proper role of women in combat"), and the deference unquestionably due the latter judgments is necessarily required in assessing the former as well. Although the District Court stressed that it was not intruding on military questions, its opinion was based on assessments of military need and flexibility in a time of mobilization. See, *e. g.,* 509 F. Supp., at 600–605. It would be blinking reality to say that

our precedents requiring deference to Congress in military affairs are not implicated by the present case.[6]

The Solicitor General argues, largely on the basis of the foregoing cases emphasizing the deference due Congress in the area of military affairs and national security, that this Court should scrutinize the MSSA only to determine if the distinction drawn between men and women bears a rational relation to some legitimate Government purpose, see *U. S. Railroad Retirement Bd.* v. *Fritz,* 449 U. S. 166 (1980), and should not examine the Act under the heightened scrutiny with which we have approached gender-based discrimination, see *Michael M.* v. *Superior Court of Sonoma County,* 450 U. S. 464 (1981); *Craig* v. *Boren,* 429 U. S. 190 (1976); *Reed* v. *Reed, supra.*[7] We do not think that the substantive guarantee of due process or certainty in the law will be advanced by any further "refinement" in the applicable tests as suggested by the Government. Announced degrees of "deference" to legislative judgments, just as levels of "scrutiny"

---

[6] Congress recognized that its decision on registration involved judgments on military needs and operations, and that its decisions were entitled to particular deference: "The Supreme Court's most recent teachings in the field of equal protection cannot be read in isolation from its opinions giving great deference to the judgment of Congress and military commanders in dealing [with] the management of military forces and the requirements of military discipline. The Court has made it unmistakably clear that even our most fundamental constitutional rights must in some circumstances be modified in the light of military needs, and that Congress' judgment as to what is necessary to preserve our national security is entitled to great deference." S. Rep. No. 96–826, pp. 159–160 (1980).

Deference to Congress' judgment was a consistent and dominant theme in lower court decisions assessing the present claim. See, *e. g., United States* v. *Clinton,* 310 F. Supp. 333, 335 (ED La. 1970); *United States* v. *Offord,* 373 F. Supp. 1117, 1118 (ED Wis. 1974).

[7] It is clear that "[g]ender has never been rejected as an impermissible classification in all instances." *Kahn* v. *Shevin,* 416 U. S. 351, 356, n. 10 (1974). In making this observation the Court noted that "Congress has not so far drafted women into the Armed Services, 50 U. S. C. App. § 454." *Ibid.*

which this Court announces that it applies to particular classifications made by a legislative body, may all too readily become facile abstractions used to justify a result. In this case the courts are called upon to decide whether Congress, acting under an explicit constitutional grant of authority, has by that action transgressed an explicit guarantee of individual rights which limits the authority so conferred. Simply labeling the legislative decision "military" on the one hand or "gender-based" on the other does not automatically guide a court to the correct constitutional result.

No one could deny that under the test of *Craig* v. *Boren, supra,* the Government's interest in raising and supporting armies is an "important governmental interest." Congress and its Committees carefully considered and debated two alternative means of furthering that interest: the first was to register only males for potential conscription, and the other was to register both sexes. Congress chose the former alternative. When that decision is challenged on equal protection grounds, the question a court must decide is not which alternative it would have chosen, had it been the primary decisionmaker, but whether that chosen by Congress denies equal protection of the laws.

Nor can it be denied that the imposing number of cases from this Court previously cited suggest that judicial deference to such congressional exercise of authority is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged. As previously noted, *supra,* at 67, deference does not mean abdication. The reconciliation between the deference due Congress and our own constitutional responsibility is perhaps best instanced in *Schlesinger* v. *Ballard,* 419 U. S., at 510, where we stated:

> "This Court has recognized that 'it is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise.' [*U. S. ex rel.*] *Toth*

v. *Quarles,* 350 U. S. 11, 17. See also *Orloff* v. *Willoughby,* 345 U. S. 83, 94. The responsibility for determining how best our Armed Forces shall attend to that business rests with Congress, see U. S. Const., Art. I, § 8, cls. 12–14, and with the President. See U. S. Const., Art. II, § 2, cl. 1. We cannot say that, in exercising its broad constitutional power here, Congress has violated the Due Process Clause of the Fifth Amendment."

Or, as put a generation ago in a case not involving any claim of gender-based discrimination:

"[J]udges are not given the task of running the Army. The responsibility for setting up channels through which . . . grievances can be considered and fairly settled rests upon the Congress and upon the President of the United States and his subordinates. The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters." *Orloff* v. *Willoughby,* 345 U. S., at 93–94.

*Schlesinger* v. *Ballard* did not purport to apply a different equal protection test because of the military context, but did stress the deference due congressional choices among alternatives in exercising the congressional authority to raise and support armies and make rules for their governance. In light of the floor debate and the Report of the Senate Armed Services Committee hereinafter discussed, it is apparent that Congress was fully aware not merely of the many facts and figures presented to it by witnesses who testified before its Committees, but of the current thinking as to the place of women in the Armed Services. In such a case, we cannot ignore Congress' broad authority conferred by the Constitution to raise and support armies when we are urged to declare

unconstitutional its studied choice of one alternative in preference to another for furthering that goal.

## III

This case is quite different from several of the gender-based discrimination cases we have considered in that, despite appellees' assertions, Congress did not act "unthinkingly" or "reflexively and not for any considered reason." Brief for Appellees 35. The question of registering women for the draft not only received considerable national attention and was the subject of wide-ranging public debate, but also was extensively considered by Congress in hearings, floor debate, and in committee. Hearings held by both Houses of Congress in response to the President's request for authorization to register women adduced extensive testimony and evidence concerning the issue. See Hearings on S. 2294; Hearings on H. R. 6569, Registration of Women, before the Subcommittee on Military Personnel of the House Committee on Armed Services, 96th Cong., 2d Sess. (1980) (hereafter House Hearings). These hearings built on other hearings held the previous year addressed to the same question.[8]

The House declined to provide for the registration of women when it passed the Joint Resolution allocating funds for the Selective Service System. See 126 Cong. Rec. 8601–8602, 8620 (1980). When the Senate considered the Joint Resolution, it defeated, after extensive debate, an amendment which in effect would have authorized the registration of women. *Id.*, at 13876–13898.[9] As noted earlier, Congress in

---

[8] See Reinstitution of Procedures for Registration Under the Military Selective Service Act: Hearing on S. 109 and S. 226 before the Subcommittee on Manpower and Personnel of the Senate Committee on Armed Services, 96th Cong., 1st Sess. (1979) (Hearing on S. 109 and S. 226). Seven months before the President's call for the registration of women, the Senate Armed Services Committee rejected the idea, see S. Rep. No. 96–226, pp. 8–9 (1979).

[9] The amendment provided that no funds "shall be made available for

H. J. Res. 521 only authorized funds sufficient to cover the registration of males. The Report of the Senate Committee on Appropriations on H. J. Res. 521 noted that the amount authorized was below the President's request "due to the Committee's decision not to provide $8,500,000 to register women," and that "[t]he amount recommended by the Committee would allow for registration of young men only." S. Rep. No. 96–789, p. 2 (1980); see 126 Cong. Rec. 13895 (1980) (Sen. Nunn).

While proposals to register women were being rejected in the course of transferring funds to register males, Committees in both Houses which had conducted hearings on the issue were also rejecting the registration of women. The House Subcommittee on Military Personnel of the House Armed Services Committee tabled a bill which would have amended the MSSA to authorize registration of women, H. R. 6569, on March 6, 1980. Legislative Calendar, House Committee on Armed Services, 96th Cong., 2d Sess., 58 (1979–1980). The Senate Armed Services Committee rejected a proposal to register women, S. 2440, as it had one year before, see S. Rep. No. 96–226, pp. 8–9 (1979), and adopted specific findings supporting its action. See S. Rep. No. 96–826, pp. 156–161 (1980). These findings were stressed in debate in the Senate on Joint Resolution 521, see 126 Cong. Rec. 13893–13894 (1980) (Sen. Nunn); *id.*, at 13880–13881 (Sen. Warner). They were later specifically endorsed by House and Senate conferees considering the Fiscal Year 1981 Defense Authorization Bill. See S. Conf. Rep. No. 96–895, p. 100 (1980).[10]

implementing a system of registration which does not include women." 126 Cong. Rec. 13876 (1980).

[10] The findings were before the conferees because the Senate Armed Services Committee had added a provision to the 1981 Defense Authorization Bill authorizing the transfer of funds to register young men as a stopgap measure should Joint Resolution 521 fail. See S. Conf. Rep. No. 96–895, at 100.

Later both Houses adopted the findings by passing the Report. 126 Cong. Rec. 23126, 23261 (1980). The Senate Report, therefore, is considerably more significant than a typical report of a single House, and its findings are in effect findings of the entire Congress.

The foregoing clearly establishes that the decision to exempt women from registration was not the " 'accidental by-product of a traditional way of thinking about females.' " *Califano* v. *Webster,* 430 U. S. 313, 320 (1977) (quoting *Califano* v. *Goldfarb,* 430 U. S. 199, 223 (1977) (STEVENS, J., concurring in judgment)). In *Michael M.,* 450 U. S., at 471, n. 6 (plurality opinion), we rejected a similar argument because of action by the California Legislature considering and rejecting proposals to make a statute challenged on discrimination grounds gender-neutral. The cause for rejecting the argument is considerably stronger here. The issue was considered at great length, and Congress clearly expressed its purpose and intent. Contrast *Califano* v. *Westcott,* 443 U. S. 76, 87 (1979) ("The gender qualification . . . escaped virtually unnoticed in the hearings and floor debates").[11]

For the same reasons we reject appellees' argument that we must consider the constitutionality of the MSSA solely on the basis of the views expressed by Congress in 1948, when the MSSA was first enacted in its modern form. Contrary to the suggestions of appellees and various *amici,* reliance on the legislative history of Joint Resolution 521 and the activity of the various Committees of the 96th Congress considering the registration of women does not violate sound principles that appropriations legislation should not be con-

---

[11] Nor can we agree with the characterization of the MSSA in the Brief for National Organization for Women as *Amicus Curiae* as a law which "coerce[s] or preclude[s] women as a class from performing tasks or jobs of which they are capable," or the suggestion that this case involves "[t]he exclusion of women from the military." *Id.,* at 19–20. Nothing in the MSSA restricts in any way the opportunities for women to volunteer for military service.

sidered as modifying substantive legislation. Congress did not change the MSSA in 1980, but it did thoroughly reconsider the question of exempting women from its provisions, and its basis for doing so. The 1980 legislative history is, therefore, highly relevant in assessing the constitutional validity of the exemption.

The MSSA established a plan for maintaining "adequate armed strength . . . to insure the security of [the] Nation." 50 U. S. C. App. § 451 (b). Registration is the first step "in a united and continuous process designed to raise an army speedily and efficiently," *Falbo* v. *United States*, 320 U. S. 549, 553 (1944), see *United States* v. *Nugent*, 346 U. S. 1, 9 (1953), and Congress provided for the reactivation of registration in order to "provid[e] the means for the early delivery of inductees in an emergency." S. Rep. No. 96–826, *supra*, at 156. Although the three-judge District Court often tried to sever its consideration of registration from the particulars of induction, see, *e. g.*, 509 F. Supp., at 604–605, Congress rather clearly linked the need for renewed registration with its views on the character of a subsequent draft. The Senate Report specifically found that "[a]n ability to mobilize rapidly is essential to the preservation of our national security. . . . A functioning registration system is a vital part of any mobilization plan." S. Rep. No. 96–826, *supra*, at 160. As Senator Warner put it, "I equate registration with the draft." Hearings on S. 2294, at 1197. See also *id.*, at 1195 (Sen. Jepsen), 1671 (Sen. Exon). Such an approach is certainly logical, since under the MSSA induction is interlocked with registration: only those registered may be drafted, and registration serves no purpose beyond providing a pool for the draft. Any assessment of the congressional purpose and its chosen means must therefore consider the registration scheme as a prelude to a draft in a time of national emergency. Any other approach would not be testing the Act in light of the purposes Congress sought to achieve.

76

Congress determined that any future draft, which would be facilitated by the registration scheme, would be characterized by a need for combat troops. The Senate Report explained, in a specific finding later adopted by both Houses, that "[i]f mobilization were to be ordered in a wartime scenario, the primary manpower need would be for combat replacements." S. Rep. No. 96–826, p. 160 (1980); see *id.*, at 158. This conclusion echoed one made a year before by the same Senate Committee, see S. Rep. No. 96–226, pp. 2–3, 6 (1979). As Senator Jepsen put it, "the shortage would be in the combat arms. That is why you have drafts." Hearings on S. 2294, at 1688. See also *id.*, at 1195 (Sen. Jepsen); 126 Cong. Rec. 8623 (1980) (Rep. Nelson). Congress' determination that the need would be for combat troops if a draft took place was sufficiently supported by testimony adduced at the hearings so that the courts are not free to make their own judgment on the question. See Hearings on S. 2294, at 1528–1529 (Marine Corps Lt. Gen. Bronars); 1395 (Principal Deputy Assistant Secretary of Army Clark); 1391 (Lt. Gen. Yerks); 748 (Gen. Meyer); House Hearings 17 (Assistant Secretary of Defense for Manpower Pirie). See also Hearing on S. 109 and S. 226, at 24, 54 (Gen. Rogers). The purpose of registration, therefore, was to prepare for a draft *of combat troops.*

Women as a group, however, unlike men as a group, are not eligible for combat. The restrictions on the participation of women in combat in the Navy and Air Force are statutory. Under 10 U. S. C. § 6015 (1976 ed., Supp. III), "women may not be assigned to duty on vessels or in aircraft that are engaged in combat missions," and under 10 U. S. C. § 8549 female members of the Air Force "may not be assigned to duty in aircraft engaged in combat missions." The Army and Marine Corps preclude the use of women in combat as a matter of established policy. See App. 86, 34, 58. Congress specifically recognized and endorsed the exclusion of women from

combat in exempting women from registration. In the words of the Senate Report:

"The principle that women should not intentionally and routinely engage in combat is fundamental, and enjoys wide support among our people. It is universally supported by military leaders who have testified before the Committee . . . . Current law and policy exclude women from being assigned to combat in our military forces, and the Committee reaffirms this policy." S. Rep. No. 96–826, *supra,* at 157.

The Senate Report specifically found that "[w]omen should not be intentionally or routinely placed in combat positions in our military services." *Id.,* at 160. See S. Rep. No. 96–226, *supra,* at 9.[12] The President expressed his intent to continue the current military policy precluding women from combat, see Presidential Recommendations 3, App. 34, and appellees present their argument concerning registration against the background of such restrictions on the use of women in combat.[13] Consistent with the approach of this Court in *Schlesinger* v. *Ballard,* 419 U. S. 498 (1975), we must examine appellees' constitutional claim concerning registration with these combat restrictions firmly in mind.

. The existence of the combat restrictions clearly indicates the basis for Congress' decision to exempt women from registration. The purpose of registration was to prepare for a draft of combat troops. Since women are excluded from combat, Congress concluded that they would not be needed in the event of a draft, and therefore decided not to register them. Again turning to the Senate Report:

"In the Committee's view, the starting point for any

---

[12] No major country has women in combat jobs in their standing army. See App. 143.

[13] See Brief for Appellees 1–2, n. 2 (denying any concession of the validity of combat restrictions, but submitting restrictions are irrelevant to the present case). See also App. 256.

discussion of the appropriateness of registering women for the draft is the question of the proper role of women in combat. . . . The policy precluding the use of women in combat is, in the Committee's view, the most important reason for not including women in a registration system." S. Rep. No. 96–826, *supra,* at 157.[14]

The District Court stressed that the military need for women was irrelevant to the issue of their registration. As that court put it: "Congress could not constitutionally require registration under the MSSA of only black citizens or only white citizens, or single out any political or religious group simply because those groups contain sufficient persons to fill the needs of the Selective Service System." 509 F. Supp., at 596. This reasoning is beside the point. The reason women are exempt from registration is not because military needs can be met by drafting men. This is not a case of Congress arbitrarily choosing to burden one of two similarly situated groups, such as would be the case with an all-black or all-white, or an all-Catholic or all-Lutheran, or an all-Republican or all-Democratic registration. Men and women, because of the combat restrictions on women, are simply not similarly situated for purposes of a draft or registration for a draft.

Congress' decision to authorize the registration of only men,

---

[14] JUSTICE MARSHALL's suggestion that since Congress focused on the need for combat troops in authorizing male-only registration the Court could "be forced to declare the male-only registration program unconstitutional," *post,* at 96, in the event of a peacetime draft misreads our opinion. The perceived need for combat or combat-eligible troops in the event of a draft was not limited to a wartime draft. See, *e. g.,* S. Rep. No. 96–826, at 157 (considering problems associated with "[r]egistering women for assignment to combat *or assigning women to combat positions in peacetime*") (emphasis supplied); *id.,* at 158 (need for rotation between combat and noncombat positions "[i]n peace and war").

therefore, does not violate the Due Process Clause. The exemption of women from registration is not only sufficiently but also closely related to Congress' purpose in authorizing registration. See *Michael M.*, 450 U. S., at 472–473 (plurality opinion); *Craig* v. *Boren,* 429 U. S. 190 (1976); *Reed* v. *Reed,* 404 U. S. 71 (1971). The fact that Congress and the Executive have decided that women should not serve in combat fully justifies Congress in not authorizing their registration, since the purpose of registration is to develop a pool of potential combat troops. As was the case in *Schlesinger* v. *Ballard, supra,* "the gender classification is not individious, but rather realistically reflects the fact that the sexes are not similarly situated" in this case. *Michael M., supra,* at 469 (plurality opinion). The Constitution requires that Congress treat similarly situated persons similarly, not that it engage in gestures of superficial equality.

In holding the MSSA constitutionally invalid the District Court relied heavily on the President's decision to seek authority to register women and the testimony of members of the Executive Branch and the military in support of that decision. See, *e. g.,* 509 F. Supp., at 603–604, and n. 30. As stated by the administration's witnesses before Congress, however, the President's "decision to ask for authority to register women is based on equity." House Hearings 7 (statement of Assistant Secretary of Defense Pirie and Director of Selective Service System Rostker); see also Presidential Recommendations 3, 21, 22, App. 35, 59, 60; Hearings on S. 2294, at 1657 (statements of Executive Associate Director of Office of Management and Budget Wellford, Director of Selective Service System Rostker, and Principal Deputy Assistant Secretary of Defense Danzig). This was also the basis for the testimony by military officials. *Id.,* at 710 (Gen. Meyer), 1002 (Gen. Allen). The Senate Report, evaluating the testimony before the Committee, recognized that "[t]he argument for registration and induction of women . . . is not based on military

necessity, but on considerations of equity." S. Rep. No. 96–826, p. 158 (1980). Congress was certainly entitled, in the exercise of its constitutional powers to raise and regulate armies and navies, to focus on the question of military need rather than "equity." [15] As Senator Nunn of the Senate Armed Services Committee put it:

"Our committee went into very great detail. We found that there was no military necessity cited by any witnesses for the registration of females.

"The main point that those who favored the registratration of females made was that they were in favor of this because of the equality issue, which is, of course, a legitimate view. But as far as military necessity, and that is what we are primarily, I hope, considering in the overall registration bill, there is no military necessity for this." 126 Cong. Rec. 13893 (1980).

See also House Hearings 20 (Rep. Holt) ("You are talking about equity. I am talking about military").[16]

Although the military experts who testified in favor of registering women uniformly opposed the actual drafting of

---

[15] The grant of constitutional authority is, after all, to Congress and not to the Executive or military officials.

[16] The District Court also focused on what it termed Congress' "inconsistent positions" in encouraging women to volunteer for military service and expanding their opportunities in the service, on the one hand, and exempting them from registration and the draft on the other. 509 F. Supp., at 603–604. This reasoning fails to appreciate the different purposes served by encouraging women volunteers and registration for the draft. Women volunteers do not occupy combat positions, so encouraging women to volunteer is not related to concerns about the availability of combat troops. In the event of a draft, however, the need would be for combat troops or troops which could be rotated into combat. See *supra*, at 76. Congress' positions are clearly not inconsistent and in treating them as such the District Court failed to understand Congress' purpose behind registration as distinguished from its purpose in encouraging women volunteers.

women, see, *e. g.*, Hearing on S. 109 and S. 226, at 11 (Gen. Rogers), there was testimony that in the event of a draft of 650,000 the military could absorb some 80,000 female inductees. Hearings on S. 2294, at 1661, 1828. The 80,000 would be used to fill noncombat positions, freeing men to go to the front. In relying on this testimony in striking down the MSSA, the District Court palpably exceeded its authority when it ignored Congress' considered response to this line of reasoning.

In the first place, assuming that a small number of women could be drafted for noncombat roles, Congress simply did not consider it worth the added burdens of including women in draft and registration plans. "It has been suggested that all women be registered, but only a handful actually be inducted in an emergency. The Committee finds this a confused and ultimately unsatisfactory solution." S. Rep. No. 96–826, *supra*, at 158. As the Senate Committee recognized a year before, "training would be needlessly burdened by women recruits who could not be used in combat." S. Rep. No. 96–226, p. 9 (1979). See also S. Rep. No. 96–826, *supra*, at 159 ("Other administrative problems such as housing and different treatment with regard to dependency, hardship and physical standards would also exist"). It is not for this Court to dismiss such problems as insignificant in the context of military preparedness and the exigencies of a future mobilization.

Congress also concluded that whatever the need for women for noncombat roles during mobilization, whether 80,000 or less, it could be met by volunteers. See *id.*, at 160; *id.*, at 158 ("Because of the combat restrictions, the need would be primarily for men, and women volunteers would fill the requirements for women"); House Hearings 19 (Rep. Holt). See also Hearings on S. 2294, at 1195 (Gen. Rogers).

Most significantly, Congress determined that staffing noncombat positions with women during a mobilization would

be positively detrimental to the important goal of military flexibility.

> ". . . [T]here are other military reasons that preclude very large numbers of women from serving. Military flexibility requires that a commander be able to move units or ships quickly. Units or ships not located at the front or not previously scheduled for the front nevertheless must be able to move into action if necessary. In peace and war, significant rotation of personnel is necessary. We should not divide the military into two groups—one in permanent combat and one in permanent support. Large numbers of non-combat positions must be available to which combat troops can return for duty before being redeployed." S. Rep. No. 96–826, *supra,* at 158.

The point was repeated in specific findings, *id.,* at 160; see also S. Rep. No. 96–226, *supra,* at 9. In sum, Congress carefully evaluated the testimony that 80,000 women conscripts could be usefully employed in the event of a draft and rejected it in the permissible exercise of its constitutional responsibility. See also Hearing on S. 109 and S. 226, at 16 (Gen. Rogers); [17] Hearings on S. 2294, at 1682. The District

---

[17] General Rogers' testimony merits quotation:

"General ROGERS. One thing which is often lost sight of, Senator, is that in an emergency during war, the Army has often had to reach back into the support base, into the supporting elements in the operating base, and pull forward soldiers to fill the ranks in an emergency; that is, to hand them a rifle or give them a tanker suit and put them in the front ranks.

"Senator WARNER. General Patton did that at one time, I believe at the Battle of the Bulge.

"General ROGERS. Absolutely.

"Now, if that support base and that operating base to the rear consists in large measure of women, then we don't have that opportunity to reach back and pull them forward, because women should not be placed in a forward fighting position or in a tank, in my opinion. So that, too, enters

Court was quite wrong in undertaking an independent evaluation of this evidence, rather than adopting an appropriately deferential examination of *Congress'* evaluation of that evidence.

In light of the foregoing, we conclude that Congress acted well within its constitutional authority when it authorized the registration of men, and not women, under the Military Selective Service Act. The decision of the District Court holding otherwise is accordingly

*Reversed.*

JUSTICE WHITE, with whom JUSTICE BRENNAN joins, dissenting.

I assume what has not been challenged in this case—that excluding women from combat positions does not offend the Constitution. Granting that, it is self-evident that if during mobilization for war, all noncombat military positions must be filled by combat-qualified personnel available to be moved into combat positions, there would be no occasion whatsoever to have any women in the Army, whether as volunteers or inductees. The Court appears to say, *ante,* at 76–77, that Congress concluded as much and that we should accept that judgment even though the serious view of the Executive Branch, including the responsible military services, is to the contrary. The Court's position in this regard is most unpersuasive. I perceive little, if any, indication that Congress itself concluded that every position in the military, no matter how far removed from combat, must be filled with combat-ready men. Common sense and experience in recent wars, where women volunteers were employed in substantial numbers, belie this view of reality. It should not be ascribed to Congress, particularly in the face of the testimony of military authorities, hereafter referred to, that there would be a sub-

the equation when one considers the subject of the utility of women under contingency conditions."

stantial number of positions in the services that could be filled by women both in peacetime and during mobilization, even though they are ineligible for combat.

I would also have little difficulty agreeing to a reversal if all the women who could serve in wartime without adversely affecting combat readiness could predictably be obtained through volunteers. In that event, the equal protection component of the Fifth Amendment would not require the United States to go through, and a large segment of the population to be burdened with, the expensive and essentially useless procedure of registering women. But again I cannot agree with the Court, see *ante*, at 81, that Congress concluded or that the legislative record indicates that each of the services could rely on women volunteers to fill all the positions for which they might be eligible in the event of mobilization. On the contrary, the record as I understand it, supports the District Court's finding that the services would have to conscript at least 80,000 persons to fill positions for which combat-ready men would not be required. The consistent position of the Defense Department representatives was that their best estimate of the number of women draftees who could be used productively by the services in the event of a major mobilization would be approximately 80,000 over the first six months. See Hearings on S. 2294 before the Senate Committee on Armed Services, 96th Cong., 2d Sess., 1681, 1688 (1980); Hearings on H. R. 6569 before the Subcommittee on Military Personnel of the House Committee on Armed Services, 96th Cong., 2d Sess., 16 (1980). This number took into account the estimated number of women volunteers, see Deposition of Director of Selective Service Bernard Rostker 8; Deposition of Principal Deputy Assistant Secretary of Defense Richard Danzig, App. 276. Except for a single, unsupported, and ambiguous statement in the Senate Report to the effect that "women volunteers would fill the requirements for women," there is no indication that Congress rejected the

Defense Department's figures or relied upon an alternative set of figures.

Of course, the division among us indicates that the record in this respect means different things to different people, and I would be content to vacate the judgment below and remand for further hearings and findings on this crucial issue. Absent that, however, I cannot agree that the record supports the view that all positions for which women would be eligible in wartime could and would be filled by female volunteers.

The Court also submits that because the primary purpose of registration and conscription is to supply combat troops and because the great majority of noncombat positions must be filled by combat-trained men ready to be rotated into combat, the absolute number of positions for which women would be eligible is so small as to be *de minimis* and of no moment for equal protection purposes, especially in light of the administrative burdens involved in registering all women of suitable age. There is some sense to this; but at least on the record before us, the number of women who could be used in the military without sacrificing combat readiness is not at all small or insubstantial, and administrative convenience has not been sufficient justification for the kind of outright gender-based discrimination involved in registering and conscripting men but no women at all.

As I understand the record, then, in order to secure the personnel it needs during mobilization, the Government cannot rely on volunteers and must register and draft not only to fill combat positions and those noncombat positions that must be filled by combat-trained men, but also to secure the personnel needed for jobs that can be performed by persons ineligible for combat without diminishing military effectiveness. The claim is that in providing for the latter category of positions, Congress is free to register and draft only men. I discern no adequate justification for this kind of discrimi-

nation between men and women. Accordingly, with all due respect, I dissent.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

The Court today places its imprimatur on one of the most potent remaining public expressions of "ancient canards about the proper role of women," *Phillips* v. *Martin Marietta Corp.*, 400 U. S. 542, 545 (1971) (MARSHALL, J., concurring). It upholds a statute that requires males but not females to register for the draft, and which thereby categorically excludes women from a fundamental civic obligation. Because I believe the Court's decision is inconsistent with the Constitution's guarantee of equal protection of the laws, I dissent.

## I

### A

The background to this litigation is set out in the opinion of the Court, *ante,* at 59–64, and I will not repeat that discussion here. It bears emphasis, however, that the only question presented by this case is whether the exclusion of women from registration under the Military Selective Service Act, 50 U. S. C. App. § 451 *et seq.* (1976 ed. and Supp. III) (MSSA), contravenes the equal protection component of the Due Process Clause of the Fifth Amendment. Although the purpose of registration is to assist preparations for drafting civilians into the military, *we are not asked to rule on the constitutionality of a statute governing conscription.*[1] With the advent of the All-Volunteer Armed Forces, the MSSA was specifically amended to preclude conscription as of July 1, 1973, Pub. L. 92–129, § 101 (a)(35), 85 Stat. 353, 50 U. S. C. App. § 467 (c), and reactivation of the draft would therefore re-

---

[1] Given the Court's lengthy discourse on the background to this litigation, it is interesting that the Court chooses to bury its sole reference to this fact in a footnote. See *ante,* at 60, n. 1.

quire a legislative amendment. See S. Rep. No. 96–826, p. 155 (1980). Consequently, we are not called upon to decide whether either men or women can be drafted at all, whether they must be drafted in equal numbers, in what order they should be drafted, or, once inducted, how they are to be trained for their respective functions. In addition, this case does not involve a challenge to the statutes or policies that prohibit female members of the Armed Forces from serving in combat.[2] It is with this understanding that I turn to the task at hand.

B

By now it should be clear that statutes like the MSSA, which discriminate on the basis of gender, must be examined under the "heightened" scrutiny mandated by *Craig* v. *Boren,* 429 U. S. 190 (1976).[3] Under this test, a gender-based classification cannot withstand constitutional challenge unless the classification is substantially related to the achievement of an important governmental objective. *Kirchberg* v. *Feenstra,* 450 U. S. 455, 459, 459–460 (1981); *Wengler* v. *Druggist Mutual Ins. Co.,* 446 U. S. 142, 150 (1980); *Califano* v. *Westcott,* 443 U. S. 76, 84 (1979); *Orr* v. *Orr,* 440 U. S. 268, 278 (1979); *Craig* v. *Boren, supra,* at 197. This test applies whether the

---

[2] By statute, female members of the Air Force and the Navy may not be assigned to vessels or aircraft engaged in combat missions. See 10 U. S. C. § 6015 (1976 ed., Supp III), § 8549. Although there are no statutory restrictions on the assignment of women to combat in the Army and the Marine Corps, both services have established policies that preclude such assignment.

Appellees do not concede the constitutional validity of these restrictions on women in combat, but they have taken the position that their validity is irrelevant for purposes of this case.

[3] I join the Court, see *ante,* at 69, in rejecting the Solicitor General's suggestion that the gender-based classification employed by the MSSA should be scrutinized under the "rational relationship" test used in reviewing challenges to certain types of social and economic legislation. See, *e. g., Schweiker* v. *Wilson,* 450 U. S. 221 (1981); *U. S. Railroad Retirement Bd.* v. *Fritz,* 449 U. S. 166 (1980).

classification discriminates against males or females. *Caban* v. *Mohammed,* 441 U. S. 380, 391 (1979); *Orr* v. *Orr, supra,* at 278–279; *Craig* v. *Boren, supra,* at 204.[4] The party defending the challenged classification carries the burden of demonstrating both the importance of the governmental objective it serves and the substantial relationship between the discriminatory means and the asserted end. See *Wengler* v. *Druggist Mutual Ins. Co., supra,* at 151; *Caban* v. *Mohammed, supra,* at 393; *Craig* v. *Boren, supra,* at 204. Consequently before we can sustain the MSSA, the Government must demonstrate that the gender-based classification it employs bears "a close and substantial relationship to [the achievement of] important governmental objectives," *Personnel Administrator of Massachusetts* v. *Feeney,* 442 U. S. 256, 273 (1979).

## C

The MSSA states that "an adequate armed strength must be achieved and maintained to insure the security of this Nation." 50 U. S. C. App. § 451 (b). I agree with the majority, *ante,* at 70, that "[n]o one could deny that . . . the Government's interest in raising and supporting armies is an 'important governmental interest.'" Consequently, the first part of the *Craig* v. *Boren* test is satisfied. But the question remains whether the discriminatory means employed itself substantially serves the statutory end. In concluding that it does, the Court correctly notes that Congress enacted (and reactivated) the MSSA pursuant to its constitutional authority to raise and maintain armies.[5] The majority also notes,

---

[4] Consequently, it is of no moment that the constitutional challenge in this case is pressed by men who claim that the MSSA's gender classification discriminates against them.

[5] The Constitution grants Congress the power "To raise and support Armies," "To Provide and maintain a Navy," and "To make Rules for the Government and Regulation of the land and naval Forces." U. S. Const., Art. I, § 8, cls. 12–14.

*ante,* at 64, that "the Court accords 'great weight to the decisions of Congress,' " quoting *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94, 102 (1973), and that the Court has accorded particular deference to decisions arising in the context of Congress' authority over military affairs. I have no particular quarrel with these sentiments in the majority opinion. I simply add that even in the area of military affairs, deference to congressional judgments cannot be allowed to shade into an abdication of this Court's ultimate responsibility to decide constitutional questions. As the Court has pointed out:

> "[T]he phrase 'war power' cannot be invoked as a talismanic incantation to support any exercise of congressional power which can be brought within its ambit. '[E]ven the war power does not remove constitutional limitations safeguarding essential liberties.' " *United States* v. *Robel,* 389 U. S. 258, 263–264 (1967), quoting *Home Bldg. & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, 426 (1934).

See *United States* v. *L. Cohen Grocery Co.,* 255 U. S. 81, 88–89 (1921); *Hamilton* v. *Kentucky Distilleries & Warehouse Co.,* 251 U. S. 146, 156 (1919); *Ex parte Milligan,* 4 Wall. 2, 121–127 (1866).

One such "safeguar[d] [of] essential liberties" is the Fifth Amendment's guarantee of equal protection of the laws.[6] When, as here, a federal law that classifies on the basis of gender is challenged as violating this constitutional guarantee, it is ultimately for this Court, not Congress, to decide whether there exists the constitutionally required "close and

---

[6] Although the Fifth Amendment contains no Equal Protection Clause, this Court has held that "the Fifth Amendment's Due Process Clause prohibits the Federal Government from engaging in discrimination that is 'so unjustifiable as to be violative of due process.' " *Schlesinger* v. *Ballard,* 419 U. S. 498, 500, n. 3 (1975), quoting *Bolling* v. *Sharpe,* 347 U. S. 497, 499 (1954).

substantial relationship" between the discriminatory means employed and the asserted governmental objective. See *Powell* v. *McCormack*, 395 U. S. 486, 549 (1969); *Baker* v. *Carr*, 369 U. S. 186, 211 (1962). In my judgment, there simply is no basis for concluding in this case that excluding women from registration is substantially related to the achievement of a concededly important governmental interest in maintaining an effective defense. The Court reaches a contrary conclusion only by using an "[a]nnounced degre[e] of 'deference' to legislative judgmen[t]" as a "facile abstractio[n] . . . to justify a result." *Ante,* at 69, 70.

## II

### A

The Government does not defend the exclusion of women from registration on the ground that preventing women from serving in the military is substantially related to the effectiveness of the Armed Forces. Indeed, the successful experience of women serving in all branches of the Armed Services would belie any such claim. Some 150,000 women volunteers are presently on active service in the military,[7] and their number is expected to increase to over 250,000 by 1985. See Department of Defense Authorization for Appropriations for Fiscal Year 1981: Hearings on S. 2294 before the Senate Committee on Armed Services, 96th Cong., 2d Sess., 1657, 1683 (1980) (1980 Senate Hearings); Women in the Military: Hearings before the Military Personnel Subcommittee of the House Committee on Armed Services, 96th Cong., 1st

---

[7] With the repeal in 1967 of a statute limiting the number of female members of the Armed Forces to 2% of total enlisted strength, the number of women in the military has risen steadily both in absolute terms and as a percentage of total active military personnel. The percentage has risen from 0.78% in 1966, to over 5% in 1976, and is expected to rise to 12% by 1985. See U. S. Dept. of Defense, Use of Women in the Military 5–6 (2d ed. 1978), reprinted at App. 98, 111–113; M. Binkin & S. Bach, Women and the Military 13–21 (1977).

and 2d Sess., 13–23 (1979 and 1980) (Women in the Military Hearings). At the congressional hearings, representatives of both the Department of Defense and the Armed Services testified that the participation of women in the All-Volunteer Armed Forces has contributed substantially to military effectiveness. See, *e. g.*, 1980 Senate Hearings, at 1389 (Lt. Gen. Yerks), 1682 (Principal Deputy Assistant Secretary of Defense Danzig); Women in the Military Hearings, at 13–23 (Assistant Secretary of Defense Pirie). Congress has never disagreed with the judgment of the military experts that women have made significant contributions to the effectiveness of the military. On the contrary, Congress has repeatedly praised the performance of female members of the Armed Forces, and has approved efforts by the Armed Services to expand their role. Just last year, the Senate Armed Services Committee declared:

> "Women now volunteer for military service and are assigned to most military specialties. These volunteers now make an important contribution to our Armed Forces. The number of women in the military has increased significantly in the past few years and is expected to continue to increase." S. Rep. No. 96–826, p. 157 (1980).

Accord, S. Rep. No. 96–226, p. 8 (1979).[8] These statements thus make clear that Congress' decision to exclude women from registration—and therefore from a draft drawing on the pool of registrants—cannot rest on a supposed need to prevent women from serving in the Armed Forces. The justification for the MSSA's gender-based discrimination must

---

[8] In summarizing the testimony presented at the congressional hearings, Senator Cohen stated:

"[B]asically the evidence has come before this committee that participation of women in the All-Volunteer Force has worked well, has been praised by every military officer who has testified before the committee, and that the jobs are being performed with the same, if not in some cases, with superior skill." 1980 Senate Hearings, at 1678.

therefore be found in considerations that are peculiar to the objectives of registration.

The most authoritative discussion of Congress' reasons for declining to require registration of women is contained in the Report prepared by the Senate Armed Services Committee on the Fiscal Year 1981 Defense Authorization Bill. S. Rep. No. 96–826, *supra*, at 156–161. The Report's findings were endorsed by the House-Senate Conferees on the Authorization Bill. See S. Conf. Rep. No. 96–895, p. 100 (1980). Both Houses of Congress subsequently adopted the findings by passing the Conference Report. 126 Cong. Rec. 23126, 23261 (1980). As the majority notes, *ante*, at 74, the Report's "findings are in effect findings of the entire Congress." The Senate Report sets out the objectives Congress sought to accomplish by excluding women from registration, see S. Rep. No. 96–826, *supra*, at 157–161, and this Court may appropriately look to the Report in evaluating the justification for the discrimination.

### B

According to the Senate Report, "[t]he policy precluding the use of women in combat is . . . the most important reason for not including women in a registration system." S. Rep. No. 96–826, *supra*, at 157; see also S. Rep. No. 96–226, *supra*, at 9. In reaffirming the combat restrictions, the Report declared:

> "Registering women for assignment to combat or assigning women to combat positions in peacetime then would leave the actual performance of sexually mixed units as an experiment to be conducted in war with unknown risk—a risk that the committee finds militarily unwarranted and dangerous. Moreover, the committee feels that any attempt to assign women to combat positions could affect the national resolve at the time of mobilization, a time of great strain on all aspects of the Nation's resources." S. Rep. No. 96–826, *supra*, at 157.

Had appellees raised a constitutional challenge to the prohibition against assignment of women to combat, this discussion in the Senate Report might well provide persuasive reasons for upholding the restrictions. But the validity of the combat restrictions is not an issue we need decide in this case.[9] Moreover, since the combat restrictions on women have already been accomplished through statutes and policies that remain in force whether or not women are required to register or to be drafted, including women in registration and draft plans will not result in their being assigned to combat roles. Thus, even assuming that precluding the use of women in combat is an important governmental interest in its own right, there can be no suggestion that the exclusion of women from registration and a draft is substantially related to the achievement of this goal.

The Court's opinion offers a different though related explanation of the relationship between the combat restrictions and Congress' decision not to require registration of women. The majority states that "Congress . . . clearly linked the need for renewed registration with its views of the character of a subsequent draft." *Ante,* at 75. The Court also states that "Congress determined that any future draft, which would be facilitated by the registration scheme, would be characterized by a need for combat troops." *Ante,* at 76. The Court then reasons that since women are not eligible for assignment to combat, Congress' decision to exclude them from registration is not unconstitutional discrimination inasmuch as "[m]en and women, because of the combat restrictions on women, are simply not similarly situated for purposes of a draft or registration for a draft." *Ante,* at 78. There is a certain logic to this reasoning, but the Court's approach is fundamentally flawed.

---

[9] As noted, see n. 2, *supra,* appellees elected not to challenge the constitutionality of the combat restrictions.

In the first place, although the Court purports to apply the *Craig* v. *Boren* test, the "similarly situated" analysis the Court employs is in fact significantly different from the *Craig* v. *Boren* approach. Compare *Kirchberg* v. *Feenstra,* 450 U. S., at 459–460 (employing *Craig* v. *Boren* test), with *id.,* at 463 (STEWART, J., concurring in result) (employing "similarly situated" analysis). The Court essentially reasons that the gender classification employed by the MSSA is constitutionally permissible because nondiscrimination is not necessary to achieve the purpose of registration to prepare for a draft of combat troops. In other words, the majority concludes that women may be excluded from registration because they will not be needed in the event of a draft.[10]

This analysis, however, focuses on the wrong question. The relevant inquiry under the *Craig* v. *Boren* test is not whether a *gender-neutral* classification would substantially advance important governmental interests. Rather, the question is whether the gender-based classification is itself substantially related to the achievement of the asserted governmental interest. Thus, the Government's task in this case is to demonstrate that excluding women from registration substantially furthers the goal of preparing for a draft of combat troops. Or to put it another way, the Government must show that registering women would substantially impede its efforts to prepare for such a draft. Under our precedents, the Government cannot meet this burden without showing that a gender-neutral statute would be a less effective means of attaining this end. See *Wengler* v. *Druggists Mutual Ins. Co.,* 446 U. S., at 151. As the Court explained in *Orr* v. *Orr,* 440 U. S., at 283 (emphasis added):

"Legislative classifications which distribute benefits and burdens on the basis of gender *carry the inherent risk of*

---

[10] I would have thought the logical conclusion from this reasoning is that there is in fact no discrimination against women, in which case one must wonder why the Court feels compelled to pledge its purported fealty to the *Craig* v. *Boren* test.

*reinforcing sexual stereotypes about the 'proper place' of women and their need for special protection. . . .* Where, as here, the [Government's] . . . purposes are as well served by a gender-neutral classification as one that gender classifies and therefore carries with it the baggage of sexual stereotypes, the [Government] cannot be permitted to classify on the basis of sex."

In this case, the Government makes no claim that preparing for a draft of combat troops cannot be accomplished just as effectively by *registering* both men and women but *drafting* only men if only men turn out to be needed.[11] Nor can the Government argue that this alternative entails the additional cost and administrative inconvenience of registering women. This Court has repeatedly stated that the administrative convenience of employing a gender classification is not an adequate constitutional justification under the *Craig* v. *Boren* test. See, *e. g., Craig* v. *Boren,* 429 U. S., at 198; *Frontiero* v. *Richardson,* 411 U. S. 677, 690–691 (1973).

The fact that registering women in no way obstructs the governmental interest in preparing for a draft of combat troops points up a second flaw in the Court's analysis. The Court essentially reduces the question of the constitutionality of male-only *registration* to the validity of a hypothetical program for *conscripting* only men. The Court posits a draft in which *all* conscripts are either assigned to those specific combat posts presently closed to women or must be available for rotation into such positions. By so doing, the Court is able to conclude that registering women would be no more than a "gestur[e] of superficial equality," *ante,* at 79, since women are necessarily ineligible for every position to be filled in its hypothetical draft. If it could indeed be guaranteed

---

[11] Alternatively, the Government could employ a classification that is related to the statutory objective but is not based on gender, for example, combat eligibility. Under the current scheme, large subgroups of the male population who are ineligible for combat because of physical handicaps or conscientious objector status are nonetheless required to register.

in advance that conscription would be reimposed by Congress only in circumstances where, and in a form under which, all conscripts would have to be trained for and assigned to combat or combat rotation positions from which women are categorically excluded, then it could be argued that registration of women would be pointless.

But of course, no such guarantee is possible. Certainly, nothing about the MSSA limits Congress to reinstituting the draft only in such circumstances. For example, Congress may decide that the All-Volunteer Armed Forces are inadequate to meet the Nation's defense needs even in times of peace and reinstitute peacetime conscription. In that event, the hypothetical draft the Court relied on to sustain the MSSA's gender-based classification would presumably be of little relevance, and the Court could then be forced to declare the male-only registration program unconstitutional. This difficulty comes about because both Congress [12] and the Court have lost sight of the important distinction between *registration* and *conscription*. Registration provides "an inventory of what the available strength is within the military qualified pool in this country." Reinstitution of Procedures for Registration Under the Military Selective Service Act: Hearing before the Subcommittee on Manpower and Personnel of the Senate Armed Services Committee, 96th Cong., 1st Sess., 10 (1979) (Selective Service Hearings) (statement of Gen. Rogers). Conscription supplies the military with the personnel needed to respond to a particular exigency. The fact that registration is a first step in the conscription process does not

---

[12] The Court quotes Senator Warner's comment: " 'I equate registration with the draft,' " *ante*, at 75. The whole of Senator Warner's statement merits quotation because it explains why Congress refused to acknowledge the distinction between registration and the draft. Senator Warner stated: "Frankly I equate registration with the draft because there is no way you can establish a registration law on a coequal basis and then turn right around and establish a draft law on a nonequal basis. I think the court would knock that down right away." 1980 Senate Hearings, at 1197.

mean that a registration law expressly discriminating between men and women may be justified by a valid conscription program which would, in retrospect, make the current discrimination appear functionally related to the program that emerged.

But even addressing the Court's reasoning on its own terms, its analysis is flawed because the entire argument rests on a premise that is demonstrably false. As noted, the majority simply assumes that registration prepares for a draft in which *every* draftee must be available for assignment to combat. But the majority's draft scenario finds no support in either the testimony before Congress, or more importantly, in the findings of the Senate Report. Indeed, the scenario appears to exist only in the Court's imagination, for even the Government represents only that "in the event of mobilization, *approximately two-thirds* of the demand on the induction system would be for *combat skills.*" Brief for Appellant 29 (emphasis added). For my part, rather than join the Court in imagining hypothetical drafts, I prefer to examine the findings in the Senate Report and the testimony presented to Congress.

C

Nothing in the Senate Report supports the Court's intimation that women must be excluded from registration because combat eligibility is a prerequisite for *all* the positions that would need to be filled in the event of a draft. The Senate Report concluded only that "[i]f mobilization were to be ordered in a wartime scenario, the *primary* manpower need would be for combat replacements." S. Rep. No. 96–826, p. 160 (1980) (emphasis added). This conclusion was in keeping with the testimony presented at the congressional hearings. The Department of Defense indicated that in the event of a mobilization requiring reinstitution of the draft, the primary manpower requirement would be for combat troops and support personnel who can readily be deployed into combat. See 1980 Senate Hearings, at 1395 (Principal

Deputy Assistant Secretary of the Army Clark), 1390 (Lt. Gen. Yerks). But the Department indicated that conscripts would also be needed to staff a variety of support positions having no prerequisite of combat eligibility, and which therefore could be filled by women. Assistant Secretary of Defense (Manpower, Reserve Affairs, and Logistics) Pirie explained:

"Not only will we need to expand combat arms, and as I said, that is the most pressing need, but we also will need to expand the support establishment at the same time to allow the combat arms to carry out their function successfully. The support establishment now uses women very effectively, and in wartime I think the same would be true." Registration of Women: Hearing on H. R. 6569 before the Subcommittee on Military Personnel of the House Committee on Armed Services, 96th Cong., 2d Sess., 17 (1980) (1980 House Hearings).

In testifying about the Defense Department's reasons for concluding that women should be included in registration plans, Pirie stated:

"It is in the interest of national security that, in an emergency requiring the conscription for military service of the Nation's youth, the best qualified people for a wide variety of tasks in our Armed Forces be available. The performance of women in our Armed Forces today strongly supports the conclusion that many of the best qualified people for some military jobs in the 18–26 age category will be women." *Id.*, at 7.

See 1980 Senate Hearings, at 171 (Secretary of the Army Alexander), 182 (Secretary of the Navy Claytor).[13] The De-

---

[13] Pirie explained the reasoning behind the Defense Department's conclusion in these terms:

"Large numbers of military women work in occupations such as electronics, communications, navigation, radar repair, jet engine mechanics, drafting,

fense Department also concluded that there are no military reasons that would justify excluding women from registration. The Department's position was described to Congress in these terms:

> "Our conclusion is that there are good reasons for registering [women]. Our conclusion is *even more strongly that there are not good reasons for refusing to register them.*" *Id.,* at 1667–1668 (Principal Deputy Assistant Secretary of Defense Danzig) (emphasis added).

All four Service Chiefs agreed that there are no military reasons for refusing to register women, and uniformly advocated requiring registration of women. The military's position on the issue was summarized by then Army Chief of Staff General Rogers: "[W]omen should be required to register for the reason that [Marine Corps Commandant] General Wilson mentioned, which is in order for us to have an inventory of what the available strength is within the military qualified pool in this country." Selective Service Hearings, at 10; see *id.,* at 10–11 (Adm. Hayward, Chief of Naval Operations; Gen. Allen, Air Force Chief of Staff; Gen. Wilson, Commandant, Marine Corps).

---

surveying, ordnance, transportation and meteorology and do so very effectively, as has been shown by numerous DOD studies and tests. The work women in the Armed Forces do today is essential to the readiness and capability of the forces. In case of war that would still be true, and the number of women doing similar work would inevitably expand beyond our peacetime number of 250,000.

"Women have traditionally held the vast majority of jobs in fields such as administrative/clerical and health care/medical. An advantage of registration for women is that a pool of trained personnel in these traditionally female jobs would exist in the event that sufficient volunteers were not available. It would make far greater sense to include women in a draft call and thereby gain many of these skills than to draft only males who would not only require training in these fields but would be drafted for employment in jobs traditionally held by females. A further advantage would be to release males currently holding noncombatant jobs for reassignment to combat jobs." 1980 House Hearings, at 6.

Against this background, the testimony at the congressional hearings focused on projections of manpower needs in the event of an emergency requiring reinstitution of the draft, and, in particular, on the role of women in such a draft. To make the discussion concrete, the testimony examined a draft scenario dealing with personnel requirements during the first six months of mobilization in response to a major war in Europe. The Defense Department indicated three constraints on the maximum number of women the Armed Services could use in the event of such a mobilization:

> "(1) legislative prohibitions against the use of women in certain military positions, (2) the policy to reserve certain assignments, such as ground combat roles, for men only, and (3) the need to reserve a substantial number of noncombat positions for men in order to provide a pool of ready replacements for ground combat positions." 1980 House Hearings, at 6 (Assistant Secretary Pirie).

After allowing for these constraints, the Defense Department reached the following conclusion about the number of female draftees that could be absorbed:

> "If we had a mobilization, our present best projection is that we could use women in some 80,000 of the jobs that we would be inducting 650,000 people for. The reason for that is because some 80,000 of those jobs, indeed more than 80,000 of those jobs are support related and not combat related.
>
> "We think women could fill those jobs quite well." 1980 Senate Hearings, at 1688 (Principal Deputy Assistant Secretary of Defense Danzig).

See *id.*, at 1661, 1665, 1828; 1980 House Hearings, at 6, 16–17 (Assistant Secretary of Defense Pirie).[14]  Finally, the De-

---

[14] The Defense Department arrived at this number after it "surveyed the military services, and asked them how many women they could use

partment of Defense acknowledged that amending the MSSA to authorize registration and induction of women did not necessarily mean that women would be drafted in the same numbers as men. Assistant Secretary Pirie explained:

> "If women were subject to the draft, the Department of Defense would determine the maximum number of women that could be used in the Armed Forces, subject to existing constraints and the needs of the Military Services to provide close combat fillers and replacements quickly. We estimate that this might require at least 80,000 additional women over the first six months. If there were not enough women volunteers, a separate draft call for women would be issued." *Id.,* at 6.

See 1980 Senate Hearings, at 1661 (Principal Deputy Assistant Secretary of Defense Danzig).

This review of the findings contained in the Senate Report and the testimony presented at the congressional hearings demonstrates that there is no basis for the Court's representation that women are ineligible for *all* the positions that would need to be filled in the event of a draft. Testimony about personnel requirements in the event of a draft established that women could fill at least 80,000 of the 650,000 positions for which conscripts would be inducted. Thus, with respect to these 80,000 or more positions, the statutes and policies barring women from combat do not provide a reason for distinguishing between male and female potential conscripts; the two groups are, in the majority's parlance, "similarly situated." As such, the combat restrictions cannot by themselves supply the constitutionally required justification for the MSSA's gender-based classification. Since the classification precludes women from being drafted to fill positions for which they would be qualified and useful, the Govern-

---

[in the event of a mobilization of] 650,000, and received answers suggesting that they could use about 80,000." 1980 Senate Hearings, at 1665 (Principal Deputy Assistant Secretary of Defense Danzig).

ment must demonstrate that excluding women from those positions is substantially related to the achievement of an important governmental objective.

## III

The Government argues, however, that the "consistent testimony before Congress was to the effect that there is *no military need* to draft women." Brief for Appellant 31 (emphasis in original). And the Government points to a statement in the Senate Report that "[b]oth the civilian and military leadership agreed that there was no military need to draft women. . . . The argument for registration and induction of women . . . is not based on military necessity, but on considerations of equity." S. Rep. No. 96–826, p. 158 (1980). In accepting the Government's contention, the Court asserts that the President's decision to seek authority to register women was based on "equity," and concludes that "Congress was certainly entitled, in the exercise of its constitutional powers to raise and regulate armies and navies, to focus on the question of military need rather than 'equity.' " *Ante,* at 80. In my view, a more careful examination of the concepts of "equity" and "military need" is required.

As previously noted, the Defense Department's recommendation that women be included in registration plans was based on its conclusion that drafting a limited number of women is consistent with, and could contribute to, military effectiveness. See *supra,* at 97–102. It was against this background that the military experts concluded that "equity" favored registration of women. Assistant Secretary Pirie explained:

"Since women have proven that they can serve successfully as volunteers in the Armed Forces, equity suggests that they be liable to serve as draftees if conscription is reinstated." 1980 House Hearings, at 7.

By "considerations of equity," the military experts acknowledged that female conscripts can perform as well as male con-

scripts in certain positions, and that there is therefore no reason why one group should be totally excluded from registration and a draft. Thus, what the majority so blithely dismisses as "equity" is nothing less than the Fifth Amendment's guarantee of equal protection of the laws which "requires that Congress treat similarly situated persons similarly," *ante,* at 79. Moreover, whether Congress could subsume this constitutional requirement to "military need," in part depends on precisely what the Senate Report meant by "military need."

The Report stated that "[b]oth the civilian and military leadership agreed that there was no military need to draft women." S. Rep. No. 96–826, *supra,* at 158. An examination of what the "civilian and military leadership" meant by "military need" should therefore provide an insight into the Report's use of the term. Several witnesses testified that because personnel requirements in the event of a mobilization could be met by drafting men, including women in draft plans is not a military necessity. For example, Assistant Secretary of Defense Pirie stated:

> "It is doubtful that a female draft can be justified on the argument that wartime personnel requirements cannot be met without them. The pool of draft eligible men . . . is sufficiently large to meet projected wartime requirements." 1980 House Hearings, at 6.

See 1980 Senate Hearings, at 1665 (Principal Deputy Assistant Secretary of Defense Danzig). Similarly, Army Chief of Staff General Meyer testified:

> "I do not believe there is a need to draft women in peacetime. In wartime, because there are such large numbers of young men available, approximately 2 million males in each year group of the draft age population, there would be no military necessity to draft females except, possibly, doctors, and other health pro-

fessionals if there are insufficient volunteers from people with those skills." *Id.*, at 749.

To be sure, there is no "military need" to draft women in the sense that a war could be waged without their participation.[15] This fact is, however, irrelevant to resolving the constitutional issue.[16] As previously noted, see *supra*, at 94–95, it is not appellees' burden to prove that registration of women substantially furthers the objectives of the MSSA.[17] Rather,

---

[15] A colloquy between Senator Jepsen and Principal Deputy Assistant Secretary of Defense Danzig reveals that some Members of Congress understood "military need" in this sense.

"Mr. Danzig. . . .

"We surveyed the military services, and asked them how many women they could use among those 650,000, and received answers suggesting that they could use 80,000.

"Let me indicate when I say they could use[,] I do not mean to imply that they would have to use women. Our Department of Defense view is that women would be useful in a mobilization scenario. If women were not available, I do not think the republic would crumble. Men could be used instead.

"Senator Jepsen. So there is no explicit military requirement involved?

. . . . .

"Mr. Danzig. My problem, Senator, and I don't mean to be semantic about it, is with the use of the words, 'explicit requirement.' If you said to me, for example, does the military require people with brown eyes to serve, I would tell you no, because people with blue eyes, et cetera, could do the job.

"On the other hand, I wouldn't deny that they could do the job and that we would find them useful." 1980 Senate Hearings, at 1665; see *id.*, at 1853–1856.

[16] Deputy Assistant Attorney General Simms explained as much to Congress in his testimony at the hearings. He stated:

"[T]he question of military necessity for drafting women is irrelevant to the constitutional issue, which is whether or not there is sufficient justification by whatever test the courts may apply for not registering women." *Id.*, at 1667.

[17] If we were to assign appellees this burden, then all of the Court's prior "mid-level" scrutiny equal protection decisions would be drawn into question. For the Court would be announcing a new approach under

because eligibility for combat is not a requirement for some of the positions to be filled in the event of a draft, it is incumbent on the Government to show that excluding women from a draft to fill those positions substantially furthers an important governmental objective.

It may be, however, that the Senate Report's allusion to "military need" is meant to convey Congress' expectation that women volunteers will make it unnecessary to draft any women. The majority apparently accepts this meaning when it states: "Congress also concluded that whatever the need for women for noncombat roles during mobilization, whether 80,000 or less, it could be met by volunteers." *Ante,* at 81. But since the purpose of registration is to protect against unanticipated shortages of volunteers, it is difficult to see how excluding women from registration can be justified by conjectures about the expected number of female volunteers.[18] I fail to see why the exclusion of a pool of persons who would be conscripted only *if needed* can be justified by reference to the current supply of volunteers. In any event, the Defense Department's best estimate is that in the event of a mobilization requiring reinstitution of the draft, there will not be

---

which the party challenging a gender-based classification has the burden of showing that *elimination* of the classification substantially furthers an important governmental interest.

[18] As Assistant Secretary of Defense Pirie explained:

"Perhaps sufficient women volunteers would come forward to meet this need, perhaps not. Having our young women register in advance would put us in a position to call women if they do not volunteer in sufficient numbers," quoted at 126 Cong. Rec. 13885–13886 (1980).

See 1980 Senate Hearings, at 1828 (Principal Deputy Assistant Secretary of Defense Danzig).

Past wartime recruitment experience does not bear out the Court's sanguine view. With the advent of the Korean War, an unsuccessful effort was made to recruit some 100,000 women to meet the rapidly expanding manpower requirements. See Use of Women in the Military, *supra* n. 7, at 5, App. 111.

enough women volunteers to fill the positions for which women would be eligible. The Department told Congress:

> "If we had a mobilization, our present best projection is that we could use women in some 80,000 of the jobs we would be *inducting* 650,000 people for." 1980 Senate Hearings, at 1688 (Principal Deputy Assistant Secretary of Defense Danzig) (emphasis added).[19]

Thus, however the "military need" statement in the Senate Report is understood, it does not provide the constitutionally required justification for the total exclusion of women from registration and draft plans.

## IV

Recognizing the need to go beyond the "military need" argument, the Court asserts that "Congress determined that staffing noncombat positions with women during a mobilization would be positively detrimental to the important goal of military flexibility." *Ante*, at 81–82. None would deny that preserving "military flexibility" is an important governmental interest. But to justify the exclusion of women from registration and the draft on this ground, there must be a further showing that staffing even a limited number of noncombat positions with women would impede military flexibility. I find nothing in the Senate Report to provide any basis

---

[19] A colloquy between Representative Hillis and Assistant Secretary of Defense Pirie at the House Hearings makes clear that the 80,000 number is in addition to the number of women serving in the All-Volunteer Armed Forces.

"Mr. PIRIE. Mr. Hillis, we estimate that we would need 650,000 individuals to be inducted over the first six months.

"Mr. HILLIS. How many of those would be women?

"Mr. PIRIE. At least 80,000 of these individuals would be women, Mr. Hillis.

"Mr. HILLIS. That is even if we had the 250,000 [women in active service expected by 1985], you are talking about another 80,000, which projects into about 330,000.

"Mr. PIRIE. Yes, sir." 1980 House Hearings, at 22.

for the Court's representation that Congress believed this to be the case.

The Senate Report concluded that "military reasons . . . preclude *very large numbers* of women from serving." S. Rep. No. 96–826, p. 158 (1980) (emphasis added). The Report went on to explain:

> "Military flexibility requires that a commander be able to move units or ships quickly. Units or ships not located at the front or not previously scheduled for the front nevertheless must be able to move into action if necessary. In peace and war, significant rotation of personnel is necessary. We should not divide the military into two groups—one in permanent combat and one in permanent support. Large numbers of non-combat positions must be available to which combat' troops can return for duty before being redeployed." *Ibid.*

This discussion confirms the Report's conclusion that drafting *"very large numbers* of women" would hinder military flexibility. The discussion does not, however, address the different question whether drafting only a *limited* number of women would similarly impede military flexibility. The testimony on this issue at the congressional hearings was that drafting a limited number of women is quite compatible with the military's need for flexibility. In concluding that the Armed Services could usefully employ at least 80,000 women conscripts out of a total of 650,000 draftees that would be needed in the event of a major European war, the Defense Department took into account both the need for rotation of combat personnel and the possibility that some support personnel might have to be sent into combat. As Assistant Secretary Pirie testified:

> "If women were subject to the draft, the Department of Defense would determine the maximum number of women that could be used in the Armed Forces, *subject to existing constraints and the needs of the Military*

*Services to provide close combat fillers and replacements quickly.* We estimate that this might require at least 80,000 additional women over the first 6 months." 1980 House Hearings, at 6 (emphasis added).

See App. 278 (deposition of Principal Deputy Assistant Secretary of Defense Danzig).[20]

Similarly, there is no reason why induction of a limited number of female draftees should any more divide the military into "permanent combat" and "permanent support" groups than is presently the case with the All-Volunteer Armed Forces. The combat restrictions that would prevent a female draftee from serving in a combat or combat rotation position also apply to the 150,000–250,000 women volunteers in the Armed Services. If the presence of increasing but controlled numbers of female volunteers has not unacceptably "divide[d] the military into two groups," it is difficult to see how the induction of a similarly limited additional number of women could accomplish this result. In these circumstances, I cannot agree with the Court's attempt to "interpret" the Senate Report's conclusion that drafting *very large numbers* of women would impair military flexibility, as proof that Congress reached the entirely different conclusion that drafting a limited number of women would adversely affect military flexibility.

---

[20] Senator Warner questioned the Service Chiefs about the "impact on your service as a consequence of a draft, *which would be based on a total provision of equality between male and female."* Selective Service Hearings, at 15 (emphasis added). Two of the Service Chiefs answered Senator Warner's question about the effect of a draft of equal numbers of men and women. Their answers merit quotation.

"General ALLEN [Air Force]. It would not have any unfavorable effect on the Air Force. We would have no objection to such a draft." *Ibid.*

"General WILSON [Marine Corps]. . . .

  .          .          .          .          .

". . . [W]e would be perfectly happy to have women drafted. That is up to the 5 percent goal which I believe we can handle in the Marine Corps." *Ibid.*

## V

The Senate Report itself recognized that the "military flexibility" objective speaks only to the question whether "very large numbers" of women should be drafted. For the Report went on to state:

"It has been suggested that all women be registered, but only a handful actually be inducted in an emergency. The committee finds this a confused and ultimately unsatisfactory solution." S. Rep. No. 96–826, p. 158 (1980).

The Report found the proposal "confused" and "unsatisfactory" for two reasons.

"First, the President's proposal [to require registration of women] does not include any change in section 5 (a) (1) of the [MSSA], which requires that the draft be conducted impartially among those eligible. Administration witnesses admitted that the current language of the law probably precludes induction of women and men on any but a random basis, which should produce roughly equal numbers of men and women. Second, it is conceivable that the courts, faced with a congressional decision to *register* men and women equally because of equity considerations, will find insufficient justification for then *inducting* only a token number of women into the Services in an emergency." *Id.*, at 158–159 (emphasis in original).

The Report thus assumed that if women are registered, any subsequent draft would require simultaneous induction of equal numbers of male and female conscripts. The Report concluded that such a draft would be unacceptable:

"It would create monumental strains on the training system, would clog the personnel administration and support systems needlessly, and would impede our defense preparations at a time of great national need.

"Other administrative problems such as housing and

110

different treatment with regard to dependency, hardship and physical standards would also exist." *Id.,* at 159.[21]

See also S. Rep. No. 96–226, p. 9 (1979). Relying on these statements, the majority asserts that even "assuming that a small number of women could be drafted for noncombat roles, Congress simply did not consider it worth the added burdens of including women in draft and registration plans." *Ante,* at 81. In actual fact, the conclusion the Senate Report reached is significantly different from the one the Court seeks to attribute to it.

The specific finding by the Senate Report was that "[i]f the law required women to be drafted *in equal numbers* with men, mobilization would be severely impaired because of strains on training facilities and administrative systems." S. Rep. No. 96–826, *supra,* at 160 (emphasis added). There was, however, no suggestion at the congressional hearings that simultaneous induction of *equal* numbers of males and female conscripts was either necessary or desirable. The Defense Department recommended that women be included in registration and draft plans, with the number of female draftees and the timing of their induction to be determined by the military's personnel requirements. See *supra,* at 100–101.[22] In endorsing this plan, the Department gave no indication that such a draft would place any strains on training and administrative facilities. Moreover, the Director of the Selective Service System testified that a registration and induction

[21] The Report further explained:

"If the Congress were to mandate equal registration of men and women, therefore, we might well be faced with a situation in which the combat replacements needed in the first 60 days—say 100,000 men—would have to be accompanied by 100,000 women. Faced with this hypothetical, the military witnesses stated that such a situation would be intolerable." S. Rep. No. 96–826, at 159.

[22] As stated in the Senate Report, "Selective Service Plans provide[d] for drafting only men during the first 60 days, and only a small number of women would be included in the total drafted for the first 180 days." *Id.,* at 158.

process including both males and females would present no administrative problems. See 1980 Senate Hearings, at 1679 (Bernard Rostker); App. 247–248 (deposition of Bernard Rostker).

The Senate Report simply failed to consider the possibility that a limited number of women could be drafted because of its conclusion that § 5 (a)(1) of the MSSA does not authorize drafting different numbers of men and women and its speculation on judicial reaction to a decision to register women. But since Congress was free to amend § 5 (a)(1), and indeed would have to undertake new legislation to authorize any draft, the matter cannot end there. Furthermore, the Senate Report's speculation that a statute authorizing differential induction of male and female draftees would be vulnerable to constitutional challenge is unfounded. The unchallenged restrictions on the assignment of women to combat, the need to preserve military flexibility, and the other factors discussed in the Senate Report provide more than ample grounds for concluding that the discriminatory means employed by such a statute would be substantially related to the achievement of important governmental objectives. Since Congress could have amended § 5 (a)(1) to authorize differential induction of men and women based on the military's personnel requirements, the Senate Report's discussion about "added burdens" that would result from drafting equal numbers of male and female draftees provides no basis for concluding that the total exclusion of women from registration and draft plans is substantially related to the achievement of important governmental objectives.

In sum, neither the Senate Report itself nor the testimony presented at the congressional hearings provides any support for the conclusion the Court seeks to attribute to the Report— that drafting a limited number of women, with the number and the timing of their induction and training determined by the military's personnel requirements, would burden training and administrative facilities.

112

## VI

After reviewing the discussion and findings contained in the Senate Report, the most I am able to say of the Report is that it demonstrates that drafting *very large numbers* of women would frustrate the achievement of a number of important governmental objectives that relate to the ultimate goal of maintaining "an adequate armed strength . . . to insure the security of this Nation," 50 U. S. C. App. § 451 (b). Or to put it another way, the Senate Report establishes that induction of a large number of men but only a limited number of women, as determined by the military's personnel requirements, would be substantially related to important governmental interests. But the discussion and findings in the Senate Report do not enable the Government to carry its burden of demonstrating that *completely* excluding women from the draft by excluding them from registration substantially furthers important governmental objectives.

In concluding that the Government has carried its burden in this case, the Court adopts "an appropriately deferential examination of *Congress'* evaluation of [the] evidence," *ante,* at 83 (emphasis in original). The majority then proceeds to supplement Congress' actual findings with those the Court apparently believes Congress could (and should) have made. Beyond that, the Court substitutes hollow shibboleths about "deference to legislative decisions" for constitutional analysis. It is as if the majority has lost sight of the fact that "it is the responsibility of this Court to act as the ultimate interpreter of the Constitution." *Powell* v. *McCormack,* 395 U. S., at 549. See *Baker* v. *Carr,* 369 U. S., at 211. Congressional enactments in the area of military affairs must, like all other laws, be *judged* by the standards of the Constitution. For the Constitution is the supreme law of the land, and *all* legislation must conform to the principles it lays down. As the Court has pointed out, "the phrase 'war power' cannot be invoked as a talismanic incantation to support any exercise of

congressional power which can be brought within its ambit." *United States* v. *Robel,* 389 U. S., at 263–264.

Furthermore, "[w]hen it appears that an Act of Congress conflicts with [a constitutional] provisio[n], we have no choice but to enforce the paramount commands of the Constitution. We are sworn to do no less. We cannot push back the limits of the Constitution merely to accommodate challenged legislation." *Trop* v. *Dulles,* 356 U. S. 86, 104 (1958) (plurality opinion). In some 106 instances since this Court was established it has determined that congressional action exceeded the bounds of the Constitution. I believe the same is true of this statute. In an attempt to avoid its constitutional obligation, the Court today "pushes back the limits of the Constitution" to accommodate an Act of Congress.

I would affirm the judgment of the District Court.