ALDISERT, Circuit Judge,
Dissenting.
I would affirm the judgment of the district court. Although I have myriad problems with the fundamental contentions presented by the Appellants and the host of supporting amicus curiae briefs, essentially my disagreement is with the all-pervasive approach that this is a case of *247 First Amendment protection in the nude. It is not.
Rather, the issues before us are threefold. First, we must inquire whether Appellants have met the high burden of overcoming the presumption of constitutionality of a congressional statute that is not only bottomed on the Spending Clause, but on a number of other specific provisions in the Constitution that deal with Congress’ obligation to support the military. This is especially relevant because, in the entire history of the United States, no court heretofore has ever declared unconstitutional on First Amendment grounds any congressional statute specifically designed to support the military.
Second, we must determine, using canons of logic, whether a permissible factual inference-let alone a compellable one-may be properly drawn that the law schools’ anti-discrimination policies are violated from the sole evidentiary datum that a military recruiter appears on campus for a short time.
Third, only if a proper inference may be drawn do we meet First Amendment considerations. The First Amendment is implicated if and only if, after applying the “balance-of-interests” test originally articulated by Justice Brennan in Roberts v. United States Jaycees, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), it can be concluded that the operation of the First Amendment trumps the several clauses of Articles I and II relating to the spending power and support of the military.
Upon analysis, the argument of the Appellants and many of the amici curiae, including but not limited to the Association of American Law Schools, is rather complex. Its point of beginning takes the following tripartite form: (1) most, but not all, accredited American law schools have adopted policies that indicate they will not discriminate based on age, race, color, national origin, disability, religion, gender or sexual orientation; (2) the law schools have committed themselves to “admit students, grant scholarships, grade exams, recruit and promote faculty, and hire staff in light of these principles” (J.A. at 509); (3) in conjunction with their own commitment not to discriminate, the law schools have adopted policies stating that they will not assist employers who discriminate.
Their intermediate statement is that the United States military excludes service members based on evidence of homosexual conduct or orientation. See 10 U.S.C. § 654 (2004). From this, the law schools conclude that permitting the military to recruit on campus for military lawyers and military judges creates a compellable inference that the law schools are violating their own policies prohibiting discrimination on the basis of sexual orientation.
They then move to the Solomon Amendment which provides that certain federal grants will not be made to “an institution of higher education ... if the Secretary of Defense determines that that institution ... has a policy or practice ... that either prohibits, or in effect prevents — (1) the Secretary of a military department or [the Department of Homeland Security] from gaining entry to campuses, or access to students (who are 17 years of age or older) on campuses, for purposes of military recruiting . ...”[28]10U.S.C. § 983.
*248 This year, Congress amended the Solomon Amendment to require military recruiting access “in a manner that is at least equal in quality and scope to the [degree of] access to campuses and to students that is provided to any other employer.” National Defense Authorization Bill for Fiscal Year 2005, Pub.L. No. 108-287 (2004).
From the foregoing premises Appellants’ Second Amended Complaint alleges that the Solomon Amendment and regulations promulgated thereunder violate the First Amendment as applied to law schools by: (1) imposing unconstitutional conditions on the receipt of federal funding; (2) effecting viewpoint discrimination; (3) forcing the plaintiffs to endorse messages repugnant to them and suppressing their expression of dissent; and (4) imposing vague and overbroad restrictions on speech.
I would hold that Congress’ use of the spending power and fulfillment of the requirements to maintain the military under Articles I and II do not unreasonably burden speech and, therefore, do not offend the First Amendment. I apply the bal-anee-of-interests test and decide that the interest of protecting the national security of the United States outweighs the indirect and attenuated interest in the law schools’ speech, expressive association and academic freedom rights. The Solomon Amendment survives the constitutional attack because its provisions, the 2004 amendments thereto and related regulations, govern conduct while only incidentally affecting speech. In serving its compelling interest in recruiting military lawyers, the statute does not require the government to engage in unconstitutional conduct. Accordingly, with respect, I dissent. I agree with the thoughtful statement of reasons of the district court and would affirm its judgment.
I.
The starting point for analysis must be fealty to the precept that congressional statutes are presumed to be constitutional. See, e.g., Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575, 108 S.Ct. 1892, 99 L.Ed.2d 645 (1988) (“ ‘[t]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.’ ”) (quoting Hooper v. California, 155 U.S. 648, 657, 15 S.Ct. 207, 39 L.Ed. 297 (1895)); NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 500, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) (“[A]n act of Congress ought not be construed to violate the Constitution if any other possible construction remains available.”). Thus in Rust v. Sullivan, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), the Court teaches:
The principle enunciated in Hooper v. California, supra and subsequent cases, is a categorical one: As between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which would save the Act. Blodgett v. Holden, 275 U.S. 142, 148, 48 S.Ct. 105, 72 L.Ed. 206 (1927) (opinion of Holmes, J.). This principle is based at least in part on the fact that a decision to declare an Act of Congress unconstitutional “is the gravest and most delicate duty that this Court is called on to perform.” Ibid. Following Hooper, supra, cases such as United States ex rel. Attorney General v. Delaware & Hudson Co., 213 U.S. 366, 408, 29 S.Ct. 527, 53 L.Ed. 836 (1909), and United States *249 v. Jin Fuey Moy, 241 U.S. 394, 401, 36 S.Ct. 658, 60 L.Ed. 1061 (1916), developed the corollary doctrine that “[a] statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score.” This canon is followed out of respect for Congress, which we assume legislates in the light of constitutional limitations. FTC v. American Tobacco Co., 264 U.S. 298, 305-307, 44 S.Ct. 336, 68 L.Ed. 696 (1924). It is qualified by the proposition that “avoidance of a difficulty will not be pressed to the point of disingenuous evasion.” George Moore Ice Cream Co. v. Rose, 289 U.S. 373, 379, 53 S.Ct. 620, 77 L.Ed. 1265 (1933).
Id. at 190-191, 111 S.Ct. 1759.
It is noted that although the Supreme Court considers this principle “a categorical one,” it is not included in the majority’s analysis.
II.
A second disagreement with the approach of my distinguished brothers of the majority is that they have not identified by name or discussed the several important provisions of the Constitution that provide for the support of the military and that antedate the promulgation of the amendments contained in the Bill of Rights.
Among the powers granted to Congress is the spending power: “The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common De-fence and general Welfare of the United States ...” U.S. Const, art. I, § 8, cl. 1. Furthermore, Congress is specifically given several powers related to the military: (1) “[t]o declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water,” id. cl. 11; (2) “[t]o raise and support Armies, but no appropriation of Money to that Use shall be for a longer Term than two Years,” id. cl. 12; (3) “[t]o provide and maintain a Navy,” id. cl. 13; and (4) “[t]o make Rules for the Government and Regulation of the land and naval Forces,” id. cl. 14.
The Constitution also authorizes Congress “[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.” Id. cl. 18.
The Constitution further states: “[t]he President shall be Commander in Chief of the Army and Navy of the United States.... ” Const, art. II, § 2, cl. 1. The President also “shall take Care that the Laws be faithfully executed ...” Id. § 3, cl. 1.
Indeed, the only oblique reference to these countervailing provisions of the Constitution appears in the majority’s discussion of the unconstitutional conditions doctrine, citing Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (public university could not condition funds for student publications on their secular perspective); FCC v. League of Women Voters, 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984) (FCC could not condition federal funds to radio stations on editorial content); and Perry v. Sindermann, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (relating to non-renewal of a contract and citing cases relating to denials of tax exemptions and welfare payments, but emphasizing that “most often, we have applied the principle to denials of public employment”).
Significantly, my research has not discovered any reported case where an act of *250 Congress exclusively predicated on supporting the military has been declared unconstitutional by application of the seminal doctrine that “[the government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests — -especially, his interest in freedom of speech.” Speiser v. Randall, 357 U.S. 513, 526-529, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958); see also Perry, 408 U.S. at 597, 92 S.Ct. 2694. By reversing the district court’s judgment, the majority has created new law, totally unsupported by binding precedent. In doing so the majority selects analogues to cases where state public accommodation statutes were involved and not a single case where an act of Congress was not only authorized by various Clauses in Articles I and II, but commanded by them.
In the posture of this case, Appellants do not urge that the Solomon Amendment is facially unconstitutional, but only that it is unconstitutional as applied to the law schools because it offends their stated policies of anti-discrimination. To succeed in their burden of overcoming the presumption of constitutionality of the Solomon Amendment, they must first demonstrate that the mere presence of recruiting officers on campus constitutes a compellable inference that the law schools will be objectively and reasonably viewed as violating their anti-discrimination policies. If they succeed at that stage, then they must demonstrate that the bite of the First Amendment under the facts of this ease is so strong as to outweigh Congress’ interests to “provide for the common Defense ...,” U.S. Const. art. I, § 8, cl. 1.; “declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water,” id. cl. 11; “raise and support Armies,” id. cl. 12; “provide and maintain a Navy,” id. cl. 13; “make Rules for the Government and Regulation of the land and naval Forces,” id. cl. 14; and for the President to “be Commander in Chief of the Army and Navy of the United States....,” U.S. Const, art. II, § 2, cl. 1; and to “take Care that the Laws be faithfully executed ...,” id. § 3, cl. 1.
Before proceeding into this analysis, it bears note that the military’s policy against homosexual activity, codified at 10 U.S.C., § 654, previously has been adjudged by a number of our sister courts of appeals not to violate the Constitution. See, e.g., Richenberg v. Perry, 97 F.3d 256, 261 (8th Cir.1996) (‘We join six other circuits in concluding that the military may exclude those who engage in homosexual acts as defined in [10 U.S.C.] § 654(f)(3)(A).”).
Moreover, in United States v. City of Phil., 798 F.2d 81 (3d Cir.1986) this court has discussed the very subject of this appeal. In that case, the Temple School of Law’s placement office invited the Judge Advocate General Corps of the Army, Navy and Marine Corps to participate in a job recruiting program on its campus. The Philadelphia Commission on Human Relations issued an order restraining the law school from doing so on the ground that the military services did not accept homosexuals. We affirmed a district court order prohibiting the Commission from taking any adverse action. After reviewing Congressional legislation implementing what we described as “the long standing Congressional policy of encouraging colleges and universities to cooperate with, and open their campuses to, military recruiters,” we stated:
We believe that only one reasonable conclusion can be drawn from this legislation: Congress considers access to college and university employment facilities by military recruiters to be a matter of paramount importance. In other words, *251 we think that Congress views such access an integral part of the military’s effort to conduct “intensive recruiting campaigns to obtain enlistments.” This conclusion is buttressed by the legislative history of these provisions. For example, a committee report accompanying the DDA Act of 1973 states, in pertinent part, that “the Committee believes that [the] national interest is best served by colleges and universities which provide for the full spectrum of opportunity for various career fields, including the military field through the Reserve Officers Training Corps program, and by the opportunity for students to talk to all recruiting sources, including military recruiters.” H.R.Rep No. 92-1149, 92d Cong., 2d Sess. 79 (1972)....
We conclude, therefore, that the Order conflicts with a clearly discernible Congressional policy concerning military recruitment on the campuses of this nation’s colleges and universities.
Id. at 86, 88. We do not write on a clean slate regarding the importance Congress places in access to college and university facilities by the military. We already have decided that issue contrary to the argument pressed by the Appellants. And we made' this determination almost twenty years ago.
III.
Before we address the application of First Amendment precepts, I am unwilling to accept that there is a permissible inference, let alone a compellable one, that a military presence on campus to recruit, in and of itself, conjures up an immediate impression of a discriminatory institution. Throughout our history, especially in times of war, like the present conflicts in Afghanistan and Iraq, and the military campaign against the A1 Qaeda, a completely different impression is evoked. The men and women in uniform are almost universally considered as heroes, sacrificing not only their lives and well-being, but living separate from all the comforts of stateside living. Again in the current era, almost every day, a candidate for President emphasized his four months as a swift boat commander in the Vietnam conflict. As masters of public opinion, the political apparatus on both sides of the aisle certainly would not put a premium on military service if the inference of the discrimination advanced by Appellants here was attached thereto. Indeed, the respect to the man and woman in uniform is so profound that in the same Presidential campaign, the other candidate was criticized for serving at home in a National Guard unit during the Vietnam conflict instead of going overseas.
This view of service in the armed forces is at the farthest polar extreme from the Appellants’ position that the mere presence of military recruiters conjures up the image of an institution that discriminates. That the military does so in fact, does not, in and of itself, generate the direct and universal feeling of loathing and abomination to the extent that their presence on campus ^ few days a year deprives law school institutions of rights inferred from the First Amendment.
What is involved here in the first instance is not operation of legal principles but precepts of logic that determine what can be properly inferred from stated circumstances. An inference is a process in which one proposition (a factual conclusion) is arrived at and affirmed on the basis of one or more other propositions, which were accepted as the starting point of the process. Professor Stebbing observes that an inference “may be defined as a mental process in which a thinker passes from the apprehension of some *252 thing given, the datum, to something, the conclusion, related in a certain way to the datum, and accepted only because the datum has been accepted.” L.S. Stebbing, A Modem Introduction to Logic 211 -212 (1948).
Inference is a process where the thinker passes from one proposition to another that is connected with the former in some way. But for the passage to be valid, it must be made according to the laws of logic that permit a reasonable movement from one proposition to another. Inference, then is “any passing from knowledge to new knowledge.” Joseph Gerard Brennan, A Handbook of Logic 1 (1957). The passage cannot be mere speculation, intuition or guessing. The key to a logical inference is the reasonable probability that the conclusion flows from the evidentiary datum because of past experiences in human affairs. A moment is necessary to discuss the difference between inference and implication. These terms are obverse sides of the same coin. We infer a conclusion from the data; the data imply a conclusion. Professor Cooley explains:
[w]hen a series of statements is an instance of a valid form of inference, the conclusion will be said to follow from the premises, and the premises to imply the conclusion. If a set of premises implies a conclusion, then, whenever the premises are accepted as true, the conclusion must be accepted as true also....
John C. Cooley, A Primer of Formal Logic 13 (1942).
As Professor Brennan put it: “In ordinary discourse, [implication] may mean' ‘to give a hint,’ • and [inference], ‘to take a hint.’ ” Brennan, A Handbook of Logic at 2-3. Drawing a proper inference is critical in this case, and this court has heretofore suggested some broad guidelines:
The line between a reasonable inference that may permissibly be drawn by a jury from basic facts in evidence and an impermissible speculation is not drawn by judicial idiosyncracies. The line is drawn by the laws of logic. If there is an experience of logical probability that an ultimate fact will follow a stated narrative or historical fact, then the jury is given the opportunity to draw a conclusion because there is a reasonable probability that the conclusion flows from the proven facts-. As the Supreme Court has stated, “The essential requirement is that mere speculation be not allowed to do duty for probative facts after making due allowance for all reasonably possible inferences favoring the party whose case is attacked.”
Tose v. First. Pa. Bank, N.A., 648 F.2d 879, 895 (3d Cir.1981) (quoting Galloway v. United States, 319 U.S. 372, 395, 63 S.Ct. 1077, 87 L.Ed. 1458 (1943)).
From these basic precepts of logic we cannot conclude that the mere presence of a uniformed military recruiter permits or compels the inference that a law school’s anti-discrimination policy is violated. It bears repetition that the passage from datum to conclusion cannot be mere speculation, intuition, or guessing, or by “judicial idiosyncracies.” The subjective idiosyncratic impressions of some law students, some professors, or some anti-war protesters are not the test. What we know as men and women we cannot forget as judges. And this we know from elementary canons of logical processes-the validity vel non of a logical inference is the reasonable probability that the conclusion flows from the evidentiary datum because of past experiences in human affairs.
A participant in a military operation cannot be ipso facto denigrated as a member of a discriminatory institution. And conjuring up such an image is the cornerstone of Appellant’s First Amendment argument.
*253 In nay view it is not necessary to meet any First Amendment argument because given the evidentiary datum of a military recruiter on campus for a few days, a proper inference may not be drawn that this, in and of itself, supports a factual conclusion that the law school is violating its anti-discrimination policy. I think that this alone is sufficient to affirm the judgment of the district court.
Nevertheless, I go further and assume that Appellants’ suggested inference may properly be drawn as a fact, and now turn to a discussion of whether First Amendment concerns trump the demands placed on Congress and the President under Articles I and II to support the military.
IV.
Our beginning point in approaching a First Amendment analysis is the balancing-of-interests test set forth in Justice Brennan’s important opinion in Roberts:
Determining the limits of state authorities over an individual’s freedom to enter into a particular association therefore unavoidably entails a careful assessment of where that relationship’s objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments. ... We need not mark the potentially significant points on this terrain with any precision.
468 U.S. at 620, 104 S.Ct. 3244 (emphasis added). Moreover, important for our immediate purposes is the recognition that “[t]he right to associate for expressive purposes is not, however, absolute. Infringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.” Id. at 623, 104 S.Ct. 3244.
Although dealing with distinctions between abortions and other procedures, Justice Blackmun emphasized that in constitutional matters we do not deal with absolutes.' “The constitutionality of such distinction will depend on its degree and the justification for it.” Bellotti v. Baird, 428 U.S. 132, 149-150, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976). For other cases discussing the necessity to weigh or balance conflicting interests, see also New York State Club Ass’n. Inc. v. City of New York, 487 U.S. 1, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988); Bd. of Dirs. of Rotary Int’l v. Rotary Club, 481 U.S. 537, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987); Dun & Bradstreet, Inc. v. Greenmoss Builders Inc., 472 U.S. 749, 758, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (“We have long recognized that not all speech is of equal First Amendment importance.”); Ohralik v. Ohio State Bar Ass’n, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978); Maher v. Roe, 432 U.S. 464, 473, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977); Whalen v. Roe, 429 U.S. 589, 599, 600 and nn. 24 and 26, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977); Zacchini v. Scripps-Howard Broad. Co., 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977) (emphasizing that a line has to be drawn between media reports that are protected and those that are not).
A.
I now turn to identify and then weigh competing interests involved in this case. I have written elsewhere that “[a]n interest is a social fact, factor or phenomenon reflected by a claim or demand or desire which human beings, either individually or as groups or associations or relations, seek to satisfy and which has been recognized as socially valid by authoritative decision makers in society.” Ruggero J. Aldisert, The Judicial Process: Text, Materials and Cases 489 (2d ed.1996) (citing authorities). *254 Two important interests conflict here. Using the formulation of Dean Roscoe Pound, they are: (1) “an interest in general safety, long recognized in the legal order in the maxim that the safety of the people is the highest law;” and (2) the social interest in political progress and individual mental self-assertion, taking form in “the [p]olicy in favor of free speech and free belief and opinion[.]” Roscoe Pound, “A Survey of Social Interests,” 57 Harv. L.Rev. 1, 17, 34 (1943).
The interest in public safety is expressed in the clauses of Articles I and II of the Constitution relating to support of the military; the interest in free speech is found in the First Amendment.
I now proceed to weigh these interests.
B.
What is perceived to be the flash point of controversy here is whether the general interest in public safety has been trumped by the interests embodied in the First Amendment. Supporting the government’s position are the line of cases emphasizing the Supreme Court’s deference to Congress’ support of the military. Arrayed against this is Appellant’s insistence that the national defense interest is trumped by the teachings of Boy Scouts of Amer. v. Dale, 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000), and Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, 515 U.S. 557, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995).
The Court has consistently deferred to congressional decisions relating to the military. “The case arises in the context of Congress’s authority over national defense and military affairs, and perhaps in no other area has the [Supreme] Court accorded Congress greater deference.” Rostker v. Goldberg, 453 U.S. 57, 64-65, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981); see also Weiss v. United States, 510 U.S. 163, 177, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994) (“Judicial deference ... ‘is at its apogee’ when reviewing congressional decision making ...” in the realm of military affairs). As the Supreme Court has explained, “[n]ot only is the scope of Congress’ constitutional power in this area broad, but the lack of competence on the part of the courts is marked.” Rostker, 453 U.S. at 65, 101 S.Ct. 2646; see also Gilligan v. Morgan, 413 U.S. 1, 10, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973) (stating “it is difficult to conceive of an area of governmental activity in which the courts have less competence ... ”).
For example, in Goldman v. Weinberger, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986), the Court rejected a Free Exercise challenge to a military dress regulation notwithstanding the plaintiffs claim that the military’s assessment of the need for the regulation “is mere ipse dixit, with no support from actual experience or a scientific study in the record, and is contradicted by expert testimony....” Id. at 509, 106 S.Ct. 1310. As the Court explained, “whether or not expert witnesses may feel that religious exceptions ... are desirable is quite beside the point[;][t]he desirability of dress regulations in the military is decided by the appropriate military officials, and they are under no constitutional mandate to abandon their considered professional judgment.” Id.
Appellants suggest that even if the military requires physical access to campuses, there is no need for military recruiters to be given the same degree of access provided to other employers. It must be emphasized that even bare physical access is more than the Appellants are willing to tolerate; they are asserting a constitutional right to exclude the military from campuses altogether. Second, it is hardly credible for the Appellants to suggest that *255 physical access alone is sufficient for effective military recruiting, particularly when other employers are being granted far more extensive and meaningful access. It is fair to assume that all of the facilities and services provided to prospective employers by law schools are intended to facilitate the hiring process. If military recruiters are denied the ability to reach students on the same terms as other employers, damage to military recruiting is not simply probable but inevitable. The Solomon Amendment reflects Congress’ judgment about the requirements of military recruiting, and “[t]he validity of such regulations does not turn on a judge’s agreement with the responsible decision maker concerning the most appropriate method for promoting significant government interests.” United States v. Albertini, 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985).
What disturbs me personally and as a judge is that the law schools seem to approach this question as an academic exercise, a question on a constitutional law examination or a moot court topic, with no thought of the effect of their action on the supply of military lawyers and military judges in the operation of the Uniform Code of Military Justice. They make it perfectly clear that they are not opposed to military institutions as such; they only want to curtail recruitment of military lawyers and judges. It is important for private employers to appear on campus to recruit law school graduates for positions with law school-sponsored “On Campus Recruiting Days” or “On Campus Interviewing” replete with interviews, followed by dinners and parties, but somehow the military will recruit its lawyers without appearing on campus. Somehow, Appellants urge, better law graduates will be attracted to the military legal branches with its lower pay and fewer benefits by some other recruiting method, for example, from the ranks of undergraduate ROTC programs.[29] Much of Appellants’ brief takes the form of conclusory statements that the military is able to attract top of the line or high quality students without stepping foot on campus. There is no explanation, however, why the law schools consider it important to have private national law firms come to campus and boast about first year associates’ salaries and signing bonuses and emphasize that if the students want to clerk for a federal judge for a year, the firm will add another bonus. This is not only OK for the private sector, but also it’s good for the law school. But we don’t want military recruiters to pollute our students. No, say the law schools, what’s sauce for the private sector goose is not sauce for the military gander. No, say the law schools, we don’t need a level playing field; let the military shift for themselves.
In its demand for total exclusion of military recruiters from their campuses, “fair play” is not a phrase in the law schools’ lexicon. They obviously do not desire that our men and women in the armed services, all members of a closed society, obtain optimum justice in military courts with the best-trained lawyers and judges. It scarcely can be an exaggeration to suggest that in many respects the need for specially competent lawyers and exceptionally qualified judges may be more important in a settled environment dominated by the *256 strictures of discipline than in the open society of civilian life.
V.
I turn now to Appellants’ compelled speech argument. They argue that the Solomon Amendment trenches on their freedom of speech by compelling them to convey a message other than their own. In making this argument, the Appellants place principal reliance on the teachings of Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston. The district court recognized, however, that nothing in Hurley suggests that the Solomon Amendment crosses the line into unconstitutionality. I agree completely and accept the government’s analysis of this issue.
A.
In Hurley, the Court held that a state public accommodation law could not constitutionally be applied to compel organizers of a St. Patrick’s Day parade to allow a group of gay, lesbian, and bisexual individuals to march in the parade for the purpose of conveying a public message about homosexual pride and solidarity. 515 U.S. at 572-581, 115 S.Ct. 2338. The organizers did not object to the participation of the group’s members in the parade; the only question was whether the group could participate in the parade “as its own parade unit carrying its own banner.” Id. at 572, 115 S.Ct. 2338. The Court concluded that the law’s “apparent object is simply to require speakers to modify the content of their expression to whatever extent beneficiaries of the law choose to alter it with messages of their own,” and that in so doing, the law “violates the fundamental rule of protection under the First Amendment! ] that a speaker has the autonomy to choose the content of his own message.” Id. at 573, 578, 115 S.Ct. 2338.
Hurley involved an effort by the government to dictate the content of a quintessential form of expressive activity-a public parade. The Court emphasized that parades “are ... a form of expression, not just motion,” and “the inherent expressiveness of marching to make a point,” id. at 568, 115 S.Ct. 2338, formed the predicate for its opinion. In contrast, there is nothing remotely so expressive about the activity of recruiting. The military engages in recruiting on college campuses for precisely the same reason as do other employers: to hire employees. Recruiting is undertaken solely for instrumental reasons, not expressive ones.
To be sure, recruiting involves speaking, but the recruiter speaks purely as part of an economic transaction, and the expression is entirely subordinate to the transaction itself. It bears no resemblance to the activities of the would-be marchers in Hurley, who formed their group “for the very purpose of marching” in the parade, and who sought to march “as a way to express pride in their Irish heritage as openly gay, lesbian, and bisexual individuals, to demonstrate that there are such men and women among those so descended, and to express their solidarity with like individuals who sought to march in New York’s St. Patrick’s Day parade.” Id. at 560, 570, 115 S.Ct. 2338. In Hurley, unlike here, expression was not a subsidiary part of an instrumental activity; expression was the activity.
The role of the parade organizers in Hurley consisted of choosing the messages that would comprise the parade, and the vice of the challenged statute was that the homosexual group’s protest message would be attributed to the organizers themselves. The Court reasoned that the group’s participation in the parade “would likely be perceived as having resulted from the Council’s customary determination about a *257 unit admitted to the parade, that its message was worthy of presentation and quite possibly of support as well.” Id. at 575, 115 S.Ct. 2338.
Here, in contrast, the likelihood that members of a law school community will perceive a military recruiter’s on-campus activities as reflecting the school’s “customary determination” that the recruiter’s message is “worthy of presentation and quite possibly of support” is vanishingly small. Unlike bystanders watching a passing parade, law school students, and to be sure, their professors, are an extraordinarily sophisticated and well-informed group, who understand perfectly well that their schools admit military recruiters not because they endorse any “message” that may be conveyed by the recruiters’ brief and transitory appearance on campus, but because the economic consequences of the Solomon Amendment have induced them to do so. The likelihood that the military’s recruiting will be seen as part of a law school’s own message is particularly small when schools can take-and have taken-ameliorative steps to publicize their continuing disagreement with the military’s policies and the reasons for their acquiescence in military recruiting.
There is nothing to prevent the law school communities from making speeches discouraging military recruiting, posting signs and erecting huge billboards on campus or public approaches announcing then-opposition and stating their reasons. That this is an important consideration has been emphasized by the Supreme Court in PruneYard Shopping Ctr. v. Robins, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980):
[fjinally, as far as appears here appellants can expressly disavow any connection with the message by simply posting signs in the area where the speakers or handbillers stand. Such signs, for example, could disclaim any sponsorship of the message and could explain that the persons are communicating their own messages by virtue of state law.
Id. at 87, 100 S.Ct. 2035.
Clearly, the interests expressed in Hurley lack the power to dilute the judiciary’s traditional deference to Congress in the interest of national defense.
In addition to arguing that the Solomon Amendment trenches on freedom of speech simpliciter, the Appellants also contend that the statute infringes on the law schools’ interests in expressive association. Although the First Amendment provides a measure of protection to expressive association, “the Supreme Court has required a close relationship between the [government] action and the affected expressive activity to find a constitutional violation.” Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh, 229 F.3d 435, 438 (3d Cir.2000). In the case at bar, the impact of the Solomon Amendment on the law schools’ interests in expressive association is far too remote to violate the First Amendment. In applying the balancing-of-interests test of Roberts, I am persuaded that the law schools’ interests here fall at the remote extreme of Justice Brennan’s spectrum — “where that relationship’s objective characteristics locate it ... [near] the most attenuated of personal attachments.” 468 U.S. at 620, 104 S.Ct. 3244. It is important to say again that “[t]he right to associate for expressive purposes is not, however, absolute.” Id. at 623, 104 S.Ct. 3244.
First Amendment claims based on expressive association are subject to a three-step constitutional inquiry. See Pi Lambda Phi, 229 F.3d at 442. The first question is “whether the group making the claim [is] engaged in expressive association.” Id. If so, the next question is whether the government action at issue *258 “significantly affect[s] the group’s ability to advocate its viewpoints.” Id. If it does, the final question is whether the governmental interests served by the law outweigh the burden imposed on the group’s associational interests. Id.; see also The Circle School v. Pappert, 381 F.3d 172, 178 (3d Cir.2004). In the case at bar the district court found as a threshold matter that law schools are engaged in expressive association, but went on to determine that the Solomon Amendment does not place a significant burden on their associational interests and that, in any event, the governmental interests served by the Solomon Amendment outweigh whatever associational burden the law may impose. (J.A. at 54-75.)
C.
The majority invokes cases like Glickman v. Wileman Bros. & Elliott, Inc., 521 U.S. 457, 469-470, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997), United States v. United Foods, Inc., 533 U.S. 405, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001), and Cochran v. Veneman, 359 F.3d 263 (3d Cir.2004), for the proposition that the Solomon Amendment impermissibly obligates them to “subsidize” military recruiting. In all these cases the challenged statutes obligated individuals to make direct payments of money to finance private speech with which they disagreed. Here, in contrast, the recruiting activities of military recruiters are paid for exclusively with federal tax revenues; the Solomon Amendment does not obligate educational institutions to pay one red cent to the government or to a private organization. Although Appellants complain of having to provide “scarce interview space” and “make appointments,” (Appellant br. at 31), this kind of physical accommodation simply does not present the constitutional concern underlying cases like Abood, Glickman. United Foods and Cochran -the concern that compelling an individual to pay for someone else’s speech impinges on his right to “believe as he will” and to have his beliefs “shaped by his mind and his conscience rather than coerced by the State.” Abood, 431 U.S. at 235, 97 S.Ct. 1782.
Unlike Abood, this case does not involve the right to make or not make “contributions for political purposes.” 431 U.S. at 234, 97 S.Ct. 1782. Unlike Glickman, there was no mandatory assessments similar to those to be paid by growers of nectarines, plums and peaches under regulations 7 C.F.R.. sections 916.31(c), 917.35(f) promulgated under the Agricultural Marketing Agreement Act, 7 U.S.C. § 601 et seq. Unlike United Foods, there were no mandatory assessments similar to those imposed on mushroom producers for the purpose of funding generic mushroom advertisements under the Mushroom Act, 7 U.S.C. § 6101. Unlike Cochran, there were no mandatory assessments similar to those imposed on milk producers under the Dairy Promotion Stabilization Act of 1983, 7 U.S.C. § 4501 et seq. The teachings of United Foods and Cochran are not applicable because, unlike the compelled advertising scheme in those cases, the principal object of the Solomon Amendment is not communication of expression but rather a furtherance of the government’s compelling interest in raising and maintaining a military force as mandated by the Constitution. Unlike a regulatory scheme requiring subsidization of generic advertising for fruit, mushrooms or milk, the Solomon Amendment “impose[s] no restraint on the freedom of any [law school] to communicate any message to any audience, ... do[es] not compel any person to engage in any actual or symbolic speech ... [and] do[es] not compel the [law schools] to endorse or to finance any political or ideological views.” Glickman v. Wileman Bros. & Elliott, Inc., 521 U.S. *259 457, 469-470, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997).
Moreover, even if law schools were being required to provide direct financial payments to the government to support military recruiting, which they manifestly are not, the First Amendment provides far more latitude for compelled financial support of governmental speech than it does for compelled support of private speech. See Abood, 431 U.S. at 259 n. 13, 97 S.Ct. 1782 (Powell, J., concurring in the judgment) (“Compelled [financial] support of a private association is fundamentally different from compelled support of government”); United States v. Frame, 885 F.2d 1119, 1130-1133 (3rd Cir.1989).
Finally, what we said in Frame is relevant here:
Both the right to be free from compelled expressive association and the right to be free from compelled affirmation of belief presuppose a coerced nexus between the individual and the specific expressive activity. When the government allocates money from the general tax fund to controversial protects or expressive activities, the nexus between the message and the individual is attenuated.
885 F.2d at 1132.
It becomes necessary to say again that our task in this case is to identify and weigh competing interests and to emphasize again that in applying the balancing-of-interests test of Roberts v. United States Jaycees, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), the law schools’ interests here fall at the remote extreme of Justice Brennan’s spectrum-“where that relationship’s objective characteristics locate it ... [near] the most attenuated of personal attachments.” 468 U.S. at 620, 104 S.Ct. 3244.
The attempt to analogize the First Amendment considerations in compelling an individual to pay for someone else’s speech with a program of military recruiting fails completely because the extreme differences in the compared factual scenarios totally dominate over any purported resemblances. What we explained in In re Linerboard Antitrust Litig., 305 F.3d 145 (3d Cir.2002), is appropriate here:
To draw an analogy between two entities is to indicate one or more respects in which they are similar and thus argue that the legal consequence attached to one set of particular facts may apply to a different set of particular facts because of the similarities in the two sets. Because a successful analogy is drawn by demonstrating the resemblances or similarities in the facts, the degree of similarity is always the crucial element. You cannot conclude that only a partial resemblance between two entities is equal to a substantial or exact correspondence.
Id. at 147.
VI.
In challenging the district court’s reasoning, Appellants also seek to analogize this case to the teachings of Dale. As the district court recognized, (J.A. 68-70), a comparison of this case to Dale shows not why the Appellants should prevail in this case, as urged by the majority, but why they must lose, see id. at 648-650, 120 S.Ct. 2446.
In Dale, the Court was presented with a New Jersey public accommodations law that compelled the Boy Scouts of America (“BSA”) to admit “an avowed homosexual and gay rights activist,” id, at 644, 120 S.Ct. 2446, as an adult member and scoutmaster. The declared mission of the BSA was to “instill values in young people,” id. at 649, 120 S.Ct. 2446, and disapproval of *260 homosexual conduct was one of BSA’s values. BSA relied on its scoutmasters to “inculcate [Boy Scouts] with the Boy Scouts’ values-both expressly and by example.” Id. at 650, 120 S.Ct. 2446. The Court reasoned that “[t]he forced inclusion of an unwanted person in a group infringes the group’s freedom of expressive association if the presence of that person affects in a significant way the group’s ability to advocate public or private viewpoints.” Id. at 648, 120 S.Ct. 2446. The Court found that “the presence of Dale as an assistant scoutmaster would surely interfere with the Boy Scouts’ choice not to propound a point of view contrary to its beliefs,” because it would “force the organization to send a message, both to the youth members and the world, that the Boy Scouts accept[] homosexual conduct as a legitimate form of behavior.” Id. at 653-654, 120 S.Ct. 2446.
Let me now count the two ways the Solomon Amendment differs from the state statute in Dale, both of which are critical to the law’s impact vel non on associational interests. First, the Solomon Amendment simply does not impinge on the right of educational institutions to determine their membership. See 10 U.S.C. § 983. It does not purport to tell colleges and universities whom to admit as students or whom to hire as professors or administrators. It merely requires them to allow the transient presence of recruiters, who are not a part of the law school and do not become members through their mere presence. In contrast to the scoutmaster in Dale, recruiters do not purport to speak “for”-and cannot reasonably be understood to be speaking “for”-the law schools that they are visiting. This case thus does not involve “[t]he forced inclusion of an unwanted person in a group.” Dale, 530 U.S. at 648, 120 S.Ct. 2446. It cannot be denied that this was the genesis of the constitutional injury in Dale.
Second, as noted in my discussion of Hurley, recruiting is an economic activity whose expressive content is strictly secondary to its instrumental goals. In contrast, the fundamental goal of the relationship between adult leaders and boys in the Boy Scout movement is “[t]o instill values in young people,” a goal that is pursued “by example” as well as by word. Id. at 649, 650, 120 S.Ct. 2446. As a result, compelling the BSA to appoint an adult leader who was committed to “advocacy of homosexual teenagers’ need for gay role models,” id. at 645, 120 S.Ct. 2446, struck at the heart of the organization’s goals.
Military recruiting is not intended to “instill values” in anyone, nor is it meant to convey any message beyond the military’s interest in enlisting qualified men and women to serve as military lawyers and judges. As a result, the burden on the law schools’ associational interests is vastly less significant than the burden imposed on the BSA by the statute in Dale.
These profound distinctions demonstrate that the teachings of Dale lack the power to dilute the judiciary’s traditional deference to Congress in the interest of national defense.
VII.
I now turn to the proper measure by which to evaluate the weighing of competing interests implicated in this case. There should be no question that the teachings of United States v. O’Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), control. In that case, the Court considered whether a 1965 amendment to the Universal Military Training and Service Act, which prohibited the knowing destruction or mutilation of a Selective Service Registration Certifícate, was unconstitutional as applied to a man who burned his certificate as a symbolic ex *261 pression of his antiwar beliefs. Id. at 369-370, 88 S.Ct. 1673. The Court stated:
We cannot accept the view that an apparently limitless variety of conduct can be labeled “speech” whenever the person engaging in the conduct intends thereby to express an idea. However, even on the assumption that the alleged communicative element in O’Brien’s conduct is sufficient to bring into play the First Amendment, it does not necessarily follow that the destruction of a registration certificate is constitutionally protected activity. This Court has held that when “speech” and “nonspeech” elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeeeh element can justify incidental limitations on First Amendment freedoms.
Id. at 376, 88 S.Ct. 1673.
In this case, the law schools portray their efforts to keep military recruiters off their campuses as “quintessential expression.” (Appellant br. at 20.) But when an institution excludes military recruiters from its campuses or otherwise restricts their access to students, it is engaging in something different from “quintessential expression.” It is engaging in a course of conduct which contains both nonspeech and speech elements. The acts which the law schools claim they are compelled to do by virtue of the military’s post — 2001 “unwritten policy” — disseminating and posting military recruitment literature, making appointments for military recruiters to meet with students and providing military recruiters a place to meet with students— also contain both nonspeech and speech elements.
The constitutional framework for evaluating such laws is provided by O’Brien. Regulation of conduct that imposes incidental burdens on expression is constitutional if “it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.” 391 U.S. at 377, 88 S.Ct. 1673. “[A]n incidental burden on speech is no greater than is essential, and therefore is permissible under O’Brien, so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.” Albertini, 472 U.S. at 689, 105 S.Ct. 2897. Regulations of conduct that place incidental burdens on expression are not subject to a least-restrictive-alternative requirement “[s]o long as the means chosen are not substantially broader than necessary to achieve the government’s interest, ... the regulation will not be invalid simply because a court concludes that the government’s interest could be adequately served by some less-speech-restrictive alternative.” Ward v. Rock Against Racism, 491 U.S. 781, 800, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).
The Solomon Amendment readily passes constitutional muster under these constitutional standards. The Appellants themselves do not dispute that the government has a substantial interesh-indeed, a compelling one-in recruiting talented men and women for the nation’s armed forces. As the Court recognized in O’Brien, “the Nation has a vital interest in having a system for raising armies that functions with maximum efficiency ...” 391 U.S. at 381, 88 S.Ct. 1673. Effective military recruiting is the linchpin of that system. See City of Phil., 798 F.2d at 86 (“Congress considers access to college and university employment facilities by military recruiters to be a matter of paramount importance.”)
*262 The government’s interest in military recruiting, as embodied in the Solomon Amendment, is manifestly “unrelated to the suppression of free expression.” O’Brien, 391 U.S. at 377, 88 S.Ct. 1673. The Solomon Amendment makes no effort to condition federal funding on the absence of campus criticism of military policies; a law school and its faculty and students are free to denounce military recruiting policies without jeopardizing federal funding in the slightest. The only thing that matters under the Solomon Amendment is whether the institution is denying access to military recruiters. And if the institution is denying access, it is irrelevant under the Solomon Amendment whether its reasons for doing so are communicative (to convey a message about its own principles or those of the military) or non-communicative (for example, to avoid participation in a recruiting process that it regards as unfair). What matters under the Solomon Amendment is “only the independent non-communicative impact of [the] conduct,” id. at 382, 88 S.Ct. 1673, — its impact on the ability of the military to reach students.
The Appellants argue that because the Solomon Amendment is intended to facilitate military recruiting, and because recruiters speak to students, the governmental interest underlying the Solomon Amendment “is not unrelated to expression.” (Appellant br. at 26.) But the question posed by O’Brien is not whether the governmental interest is “unrelated to expression,” but instead whether the interest “is unrelated to the suppression of free expression.” 391 U.S. at 377, 88 S.Ct. 1673 (emphasis added). The Appellants’ argument deliberately omits the touchstone of suppression from the constitutional test. Once it is recognized that suppression of expression is the focus of O’Brien, the Appellants’ argument falls apart, for the governmental interests served by the Solomon Amendment are manifestly unrelated to the suppression of anyone’s expression.
It bears constant emphasis that the First Amendment test involves a balancing-of-interests as repeatedly emphasized above. The O’Brien measure is quintessentially correct because this case involves a weighing of the government’s interest in national defense and Appellants’ interest in First Amendment protections. In this posture it is difficult to conjure a case that is a more perfect fit for the exposition in O’Brien.
For the foregoing reasons, I respectfully dissent.

. Congress has clarified that the funding restriction does not apply to the following: (1) federal grants of funds "to be available solely for student financial assistance or related administrative costs,” Pub.L. No. 106-79, § 8120, 113 Stat. 1260 (Oct. 25, 1999); (2) an institution that ceased its prior policy or practice of prohibiting or effectively preventing entry to campus or access to students on campus for military recruiting, 10 U.S.C. *248 § 983(c)(1); and (3) an institution that "has a longstanding policy of pacifism based on historical religious affiliation,” 10 U.S.C. § 983(c)(2).

. The following colloquy took place at the oral argument:
THE COURT: What else could the government do as a less restrictive alternative?
MR. ROSENKRANTZ: [A]ny number of things. Number one, ROTC, the single most effective recruiting device the military has, by their own admission.
(Tr. at 25.)